UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                    :
NORTH FORK PARTNERS INVESTMENT                                      :
HOLDINGS, LLC,                                                      :
                                                                    :
                              Plaintiff,                            :          20-cv-2444 (LJL)
                                                                    :
              -v-                                                   :          OPINION AND ORDER
                                                                    :
W. CHRISTOPHER BRACKEN, et al.,                                     :
                                                                    :
                              Defendants.                           :
                                                                    :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_11/23/2020__

LEWIS J. LIMAN, United States District Judge:

Defendants Christopher Erb ("Erb"), Kenneth F. Elias ("Elias"), W. Christopher Bracken ("Bracken"), William Henagan ("Henagan"), and Richard Spencer ("Spencer") move to dismiss the complaint against them pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 9(b).  For the reasons below, the motions to dismiss are granted without prejudice.

## BACKGROUND

The Court assumes familiarity with its prior opinion in this case.  *See N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2020 WL 2521448, at *1 (S.D.N.Y. May 18, 2020).

Plaintiff North Fork Partners Investment Holdings, LLC ("Plaintiff" or "North Fork") is a Delaware limited liability company.  Dkt. No. 24 ("Amended Complaint" or "AC") ¶ 35. Bracken is the former CEO, director, and member of Patriot Finance, LLC ("Patriot"), a limited liability company formed under the laws of the state of Georgia and engaged in the business of providing consumer loans.  *Id.* ¶¶ 36, 41, 44.  Henagan and Spencer are directors and members of Patriot.  *Id.* ¶¶ 37-38.  Erb and Elias are both corporate officers of Congressional Bank, a Maryland state-chartered bank ("Congressional Bank").  *Id.* ¶¶ 39-40.

The action arises out of a $650,000 mezzanine loan Plaintiff provided to Patriot (the "Mezzanine Loan") pursuant to a Mezzanine Loan and Security Agreement and Promissory Note on August 3, 2018 (the "Mezzanine Agreement"). *Id.* ¶ 45; *see* Dkt. No. 43-2. Prior to the Mezzanine Loan, Congressional Bank had entered into a separate loan with Patriot. AC ¶ 47. On the same day Plaintiff entered into the Mezzanine Agreement with Patriot, Plaintiff also entered into a Subordination and Intercreditor Agreement ("Intercreditor Agreement") with both Patriot and Congressional Bank. AC ¶ 47; Dkt. No. 43-3.[1] Pursuant to the Intercreditor Agreement, Congressional Bank was a senior lender, Plaintiff was a subordinated creditor, Patriot was the borrower, and Bracken was a personal guarantor. Dkt. No. 43-3. Patriot ultimately defaulted on both the Mezzanine Loan and the loan from Congressional Bank, and Patriot's assets were eventually transferred to Congressional Bank, causing Plaintiff financial injury. AC ¶¶ 30, 86, 90.

The Mezzanine Agreement states that it is between Patriot, described as a "Georgia limited liability company," and Plaintiff, described as a "Delaware limited liability company." Dkt. No. 43-2. It directs that "Notices" are to be sent to Patriot (with attention to Bracken) in Georgia and to Plaintiff (with attention to John Fernando ("Fernando")) in New York. *Id.*, Section 9.6. The Mezzanine Agreement is signed by Bracken on behalf of Patriot and Fernando on behalf of Plaintiff.

---

[1] "Courts may consider affidavits and documents submitted by the parties when deciding a Rule 12(b)(2) motion." *Wallace Church & Co., Inc. v. Wyattzier, LLC*, 2020 WL 4369850, at *1 n.1 (S.D.N.Y. July 20, 2020). For purposes of this motion, the Court accepts as true the facts alleged in the Amended Complaint and Plaintiff's affidavits in opposition to the motion to dismiss for lack of personal jurisdiction. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 27-28 (2d Cir. 1996).

The Mezzanine Agreement contains a provision regarding "Consent to Jurisdiction and

Service of Process" that provides for consent to jurisdiction in New York:

> **9.16**   **Consent to Jurisdiction and Service of Process.**   EACH OF BORROWER AND THE LENDER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT IN NEW YORK COUNTY, NEW YORK, AND IRREVOCABLY AGREES THAT ANY ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THE NOTE, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL ONLY BE LITIGATED IN SUCH COURTS. EACH PARTY TO THIS AGREEMENT ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.

*Id.*, Section 9.16.  It also describes New York as the governing law:

> **9.3**   **Governing Law.**  The Loan Documents and all rights and obligations of the parties thereunder shall be governed by and be construed and enforced in accordance with the laws of the State of New York without regard to principles of conflict of laws.

*Id.*, Section 9.3.  It provides that in the event of a default:

> Lender [Plaintiff] shall have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of New York and any additional rights and remedies which may be provided to a secured party in any jurisdiction in which Collateral is located.

*Id.*, Section 8.2(b).

The Intercreditor Agreement states that it is between Patriot, Bracken, Congressional

Bank, and Plaintiff.  Dkt. No. 43-3.  As in the Mezzanine Agreement, the Intercreditor

Agreement directs that "Notices" are to be sent to each party: Patriot in Georgia, Bracken in

Georgia, Plaintiff (with attention to Fernando) in New York, and Congressional Bank (with

attention to Erb) in Maryland.  *Id.*, Section 9.  The Intercreditor Agreement is signed by Bracken

on behalf of Patriot and himself, Fernando on behalf of North Fork, and the executive vice

president of Congressional Bank.

The Intercreditor Agreement contains a provision regarding "Consent to Jurisdiction" that

provides for consent to jurisdiction in Maryland:

> **18.** **Consent to Jurisdiction.** BORROWER, GUARANTOR, SENIOR LENDER AGENT, AND SUBORDINATED CREDITOR HEREBY IRREVOCABLY CONSENT TO THE EXCLUSIVE JURISDICTION OF ANY COURT OF THE STATE OF MARYLAND LOCATED IN MONTGOMERY COUNTY, OR IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND, GREENBELT DIVISION, ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OF THE SUBORDINATED CREDIT DOCUMENTS OR ANY OF THE LOAN DOCUMENTS IN ANY ACTION OR PROCEEDING. BORROWER, GUARANTOR, SENIOR LENDER, SENIOR AGENT, AND SUBORDINATED CREDITOR HEREBY SUBMIT TO, AND WAIVE ANY OBJECTION THEY MAY HAVE TO, EXCLUSIVE PERSONAL JURISDICTION AND VENUE IN THE COURTS OF THE STATE OF MARYLAND AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND WITH RESPECT TO ANY DISPUTES ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OF THE SUBORDINATED CREDIT DOCUMENTS OR ANY OF THE LOAN DOCUMENTS, AND HEREBY IRREVOCABLY WAIVE AND AGREE, TO THE EXTENT PERMITTED BY LAW, NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH DISPUTE BROUGHT IN ANY SUCH COURT" HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

*Id.*, Section 18. It also describes Maryland as the governing law:

> **17.** **Governing Law.** THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES HERETO, AND/OR THE INTERPRETATION AND/OR ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MARYLAND, WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS THEREOF.

*Id.*, Section 17. The Intercreditor Agreement makes reference to the Mezzanine Agreement

(referred to in the Intercreditor Agreement as the "Subordinated Credit Agreement").

Plaintiff alleges that it was the victim of fraud—that at the time it entered into the

agreements with Patriot and Congressional Bank, Defendants knew that Patriot was in poor

financial health but nonetheless represented otherwise and issued fraudulent financial reports to induce Plaintiff to enter into the agreements and to hide the fact that they were making conveyances from Patriot's assets.  The allegations are in three parts.

First, Plaintiff alleges it was induced to make the loan by false representations by Erb and Elias that Patriot was "a good borrower."  AC ¶ 3.  Specifically, Plaintiff alleges that Erb, "acting in concert" with Elias, on March 28, 2018, telephoned Plaintiff's representative, Fernando, in New York, and misrepresented that Patriot's financial condition was "excellent."  *Id.* ¶¶ 3, 17; *see also id.* ¶ 49.  Erb allegedly stated that Patriot "was a good borrower" in healthy financial condition and that he and Elias "wanted Plaintiff to provide the mezzanine loan to" Patriot because it was an opportunity for Plaintiff "to make a profit."  *Id.* ¶¶ 3, 17, 49-50.  But at the time, Plaintiff alleges, Patriot was in multiple covenant defaults.  *Id.* ¶ 3.  Plaintiff claims that Erb and Elias knew about the multiple covenant defaults, but concealed them, to protect the value of Congressional Bank's more senior loan to Patriot.  On some unspecified date, Erb and Elias also allegedly indicated that Patriot's "collateral was performing well" and "represented that [Patriot] had an excellent portfolio of loans and was a good business to lend money to based on [Congressional Bank's] transactions with it as lenders and the strength of this portfolio of loans."  *Id.* ¶¶ 4, 55.  In numerous emails to Plaintiff's representatives over the course of several months, Erb and Elias represented that they "were doing everything to help Patriot grow and saw great potential for Patriot," *id.* ¶ 52, without disclosing—and while actively concealing—their knowledge of Patriot's misrepresentation of the health of Patriot's portfolio, *id.* ¶¶ 9, 55, 127. Plaintiff alleges that it made the loan on the basis of the misrepresentations by Erb and Elias.

Second, Plaintiff alleges that, after Plaintiff made the loan, Bracken, Henagan and Spencer submitted fraudulent financial reports to Plaintiff in New York "to disguise their gross

mismanagement of Patriot LLC allowing them to continue their self-serving taking of funds from Patriot LLC with an intent to victimize the Plaintiff by exposing it to actual financial loss." *Id.* ¶ 5; *see also id.* ¶¶ 24, 67, 108.  Specifically, Plaintiff alleges that between November 1, 2018 and June 6, 2019, Bracken sent Plaintiff updated monthly collateral reports that were fraudulent and misrepresented the health and status of Patriot's consumer debts portfolio. *Id.* ¶ 25.  Plaintiff claims, on information and belief, that Henagan and Spencer had to approve Bracken's reports. *Id.* ¶ 64.  Henagan also sent updated collateral reports containing "incorrect and fraudulent data" on August 3 and 5, 2019, and "thereafter on multiple occasions."  *Id.* ¶ 26.  Plaintiff alleges that these "fraudulent financial reports were being issued only to buy time and continue their self-serving payments as members of Patriot."  *Id.* ¶ 29.

Third, Plaintiff alleges a scheme to divert Patriot's assets to Bracken, Henagan, and Spencer, *id.* ¶ 79, and to third parties, *id.* ¶¶ 89-91, 96-99.  In July 2019, the board of managers of Patriot terminated the employment of Bracken, stating that he had concealed the severity of the need to raise equity.  *Id.* ¶¶ 69, 71.  Plaintiff alleges the fraud was discovered thereafter in September 2019, when Henagan and Spencer sent a collateral report indicating a substantial increase in the number of collateral loans that were between 60-90 days delinquent.  *Id.* ¶¶ 68, 76-80.  This increase was much greater than the loans that were 30-60 days delinquent in the immediately preceding month, "a mathematical impossibility based upon the passage of time." *Id.* ¶¶ 27, 68.  Congressional Bank expressed no interest in investigating the potential fraud, but instead hired an advisor, Andy Cooney ("Cooney"), to help sell Patriot's collateral.  *Id.* ¶¶ 80-86. Plaintiff alleges that, despite Plaintiff's protestations, Patriot paid the advisor $125,000, a price that exceeded the market price, despite the fact that the advisor never found a buyer for the collateral.  *Id.* ¶¶ 89-91.  Congressional Bank ultimately absorbed the collateral and did not

pursue Bracken's personal guarantee on the loan.  *Id.* ¶¶ 90, 93.  Plaintiff claims that

Congressional Bank then used "Patriot's assets" to pay unsecured creditors in an amount higher

than that necessary to protect and preserve the collateral and also paid interest on subordinate

unsecured debt held by equity shareholders, which Plaintiff alleges further demonstrated lack of

"proper business judgment."  *Id.* ¶¶ 96-98.  Plaintiff alleges that all of these efforts were

designed to conceal the default of Patriot and to avoid Bracken having to pay on his personal

guarantee.

On the basis of those allegations, Plaintiff asserts claims for (1) fraudulent conveyances

under New York Debtor and Creditor Law § 273 against Bracken, Henagan and Spencer, *id.*

¶¶ 112-25; (2) fraud against Erb and Elias, *id.* ¶¶ 126-32; and (3) fraud against Bracken,

Henagan, and Spencer, *id.* ¶¶ 133-39.

## PROCEDURAL HISTORY

Plaintiff filed its initial complaint in New York State Supreme Court on February 21,

2020.  Dkt. No. 1-1.  Defendants timely removed the action to this Court pursuant to the Court's

diversity jurisdiction.  Dkt. No. 1.  On March 27, 2020, Erb and Elias moved to dismiss for

failure to state a claim and for lack of personal jurisdiction, which the Court granted without

prejudice to Plaintiff filing an amended complaint.  Dkt. No.  17.  Plaintiff filed the Amended

Complaint on June 19, 2020.  Discovery has been stayed during the pendency of the motion.

## LEGAL STANDARDS

### I.      Fed. R. Civ. P. 12(b)(2)

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of

any claims raised must first address the jurisdictional question" and must dismiss the action

against any defendant over whom it lacks personal jurisdiction.  *Lugones v. Pete & Gerry's*

*Organic, LLC*, 2020 WL 871521, at *2 (S.D.N.Y. Feb. 21, 2020) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)); *see* Fed. R. Civ. P. 12(b)(2).

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). When, as here, discovery has yet to occur, plaintiffs need only make a prima facie showing of jurisdiction by "pleading in good faith legally sufficient allegations of jurisdiction." *Ball*, 902 F.2d at 197.

This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec.*, 722 F.2d at 85. While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.*, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013).

To determine whether the exercise of personal jurisdiction is proper in a diversity case, the Court must conduct a two-part inquiry: first, the Court looks at whether there is a basis for personal jurisdiction under the laws of the forum state, and second, the Court must examine whether the exercise of personal jurisdiction comports with constitutional due process. *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).

## II.      Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  However, although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).  The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (internal quotation marks and citation omitted).

**DISCUSSION**

I.     **Motions to Dismiss for Lack of Personal Jurisdiction**

New York's general jurisdiction statute provides for jurisdiction over "persons, property, or status as might have been exercised heretofore."  N.Y. C.P.L.R. § 301.  A defendant is subject to personal jurisdiction if it is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence' in this jurisdiction."  *Laufer v. Ostrow*, 434 N.E. 692, 694 (1982) (quoting *McGowan v. Smith*, 419 N.E.2d 321, 323 (1981)).  However, an employee who is engaged in business in the state "does not subject himself, individually, to the CPLR 301 jurisdiction of [New York] courts unless he is doing business in our State individually."  *Id.* at 696; *see Wallace Church*, 2020 WL 4369850, at *5 (holding that jurisdiction under N.Y. C.P.L.R. § 301 did not lie where conduct of individual defendants in New York was within their role as corporate principals); *Brinkmann v. Adrian Carriers, Inc.*, 815 N.Y.S.2d 196, 199 (2d Dep't 2006) ("An individual cannot be subject to jurisdiction under CPLR 301 unless he is doing business in New York as an individual rather than on behalf of a corporation.").

New York's specific jurisdiction statute states that "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent":

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).[2]

"Unlike CPLR § 301, CPLR § 302 allows courts to exercise specific jurisdiction over corporate principals based on transactions made or acts taken in a corporate capacity." *Wallace Church*, 2020 WL 4369850, at *6; *see Retail Software Servs. Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (upholding long-arm jurisdiction over corporate employees who were the "primary actors" in the transaction in New York that was the source of the litigation) (citing *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 47 (1988)).

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(1), Plaintiff must allege that: (1) a defendant has "transacted business" in New York, and (2) the claim asserted arises from that business activity. *Eades v. Kennedy PC Law Offs.*, 799 F.3d 161, 168 (2d Cir. 2015); *see Licci*, 732 F.3d at 168. Under the first prong, a non-domiciliary defendant need not be physically present in New York to "transact business," so long as the defendant has engaged in "purposeful activity," for example, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-47 (2d Cir. 2007) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Section 302(a)(1) is a "'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction." *Kreutter*,

---

[2] Plaintiff does not argue for general jurisdiction under N.Y. C.P.L.R. § 301, which would not exist in any event.

522 N.E.2d at 43.  The court looks to the "quality" and not the quantity of the contacts. *Fischbarg v. Doucet*, 880 N.E.2d 22, 26-27 (2007) (purposeful activity where defendant attempted to establish relationship through calls, faxes and emails projected into New York over months).  As to the second element, a claim arises from a particular transaction when there is "some articulable nexus between the business transacted and the cause of action sued upon or where there is a substantial relationship between the transaction or the claim asserted." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii), Plaintiff must allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 162 (2011).

Under Section 302(a)(3), a defendant's "act must have caused injury to a person or property within New York." *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 325-26 (S.D.N.Y. 2013).  In determining whether an injury to person or property in New York has been alleged, courts apply a "situs-of-injury test, which asks them to locate the original event which caused the injury." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999).  "This 'original event' is . . . generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Id.*  "The situs of such a nonphysical commercial injury is the place where the critical events associated with the dispute took place and not where the resultant monetary loss occurred." *Darby Trading, Inc. v. Shell Int'l Trading and Shipping Co.*, 568 F. Supp.2d 329, 337 (S.D.N.Y. 2008).

Moreover, the defendant must expect or have "reason to expect that his or her tortious activity in another State will have *direct* consequences in New York." *LaMarca v. Pak-Mor Mfg. Co.*, 735 N.E.2d 883, 886 (2000). "In commercial torts, the courts have uniformly held that the mere fact that the plaintiff resides in New York and therefore ultimately experiences a financial loss there is not a sufficient basis for jurisdiction under 302(a)(3)." *Interface Biomedical Labs. Corp. v. Axiom Medical, Inc.*, 600 F. Supp. 731, 739 (E.D.N.Y. 1985).

### A.    Erb and Elias

Plaintiff argues that there is personal jurisdiction over Erb and Elias pursuant to both N.Y. C.P.L.R. §§ 302(a)(1) and 302(a)(3)(ii).[3]

The Amended Complaint alleges that, on March 28, 2018, Erb and Elias made a telephone call to Fernando in New York during which they falsely represented that Patriot's financial condition was excellent. AC ¶¶ 17-19, 49-50. It alleges that the next day, on March 29, 2018, Erb emailed Plaintiff's representatives Fernando in New York and Noah Cutler ("Cutler") in Florida to introduce Plaintiff to Bracken and Spencer and to start working on the Mezzanine Loan. *Id.* ¶ 51. Plaintiff further alleges that "[t]hrough the months of April and May of the year 2018, Defendants Erb and Elias, from Maryland, called Fernando in New York on several occasions" and during that time "continued to represent the good financial health of Patriot and how this would be a great business deal for Plaintiff." *Id.* ¶ 52. As a result of these

---

[3] As the Court's prior opinion noted, it is not in dispute that Erb and Elias are not subject to general personal jurisdiction in New York. Erb and Elias are citizens and residents of and domiciled in Maryland, and are not alleged to have "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of [their] 'presence' in this jurisdiction." *Laufer*, 434 N.E. at 694; *see N. Fork Inv.*, 2020 WL 2521448, at *2 (noting that the "affidavits submitted by Erb and Elias state that neither owns property in New York, maintains a bank account in New York, has an office in New York, employs individuals in New York, has an agent for service of process in New York, has a New York telephone number, or solicits business in New York in their individual capacities").

interactions and the alleged misrepresentations therein, Plaintiff entered into the Mezzanine

Agreement with Patriot and the Intercreditor Agreement in which it subordinated its loan to

Patriot for the benefit of Congressional Bank.  *Id.* ¶ 19, 58.

These facts are sufficient to establish personal jurisdiction under N.Y. C.P.L.R.

§ 302(a)(1).  While "[c]ourts applying New York law have declined to extend jurisdiction over

defendants simply on the basis of telephone calls and other communications sent to New York,"

*DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 420 (S.D.N.Y. 2010), where

"the purpose of the calls is for the defendant to actively participate in business in New York, then

they alone may support a finding" of personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1),

*Digit. Lab Sols., LLC v. Stickler*, 2007 WL 700821, at *3 (S.D.N.Y. Mar. 7, 2007) (quoting

*Carlson v. Cuevas*, 923 F. Supp. 76, 78 (S.D.N.Y. 1996)).  Here, the Amended Complaint alleges

that Erb and Elias contacted Plaintiff in New York for the purpose of pitching an investment

opportunity.  They continued to reach out to Plaintiff in New York to convince Plaintiff to agree

to invest in Patriot and ultimately sign the Mezzanine Agreement and Intercreditor Agreement.

"[W]here the non-domiciliary seeks out and initiates contact with New York, solicits business in

New York, and establishes a continuing relationship, a non-domiciliary can be said to transact

business within the meaning of CPLR 302(a)(1)."  *Paterno v. Laser Spine Inst.*, 23 N.E.3d 988,

993 (2014).

Erb and Elias argue that Congressional Bank did not engage in any "transaction" because

it was not party to the Mezzanine Agreement, and because Plaintiff concedes that the loan

agreement between Congressional Bank and Plaintiff (*i.e.,* the Intercreditor Agreement) was a

"Maryland transaction."  Dkt. No. 38 at 5.  That argument takes too narrow a view of

"transaction," which encompasses both the Mezzanine Agreement and Intercreditor Agreement.

The Amended Complaint alleges that Erb and Elias represented they were looking for someone to give a mezzanine loan to Patriot and that the loan would be subordinated to Congressional Bank's existing loan.  AC ¶ 50.  That the lender would be required to enter into both agreements as part of the same transaction, and that Congressional Bank would not enter into such an arrangement otherwise, is also supported by the language of the Intercreditor Agreement.  The Intercreditor Agreement—to which Congressional Bank is party—states that it was a condition precedent to Congressional Bank's agreement to consent to the Mezzanine Agreement—to which Congressional Bank was not party—that the Intercreditor Agreement be entered into:

> As an inducement to and as one of the conditions precedent to the agreement of Senior Agent [Congressional Bank] . . . to consent to the transactions contemplated by the Subordinated Credit Agreement [the Mezzanine Agreement], Senior Agent has required the execution and delivery of this Agreement by Subordinated Creditor [Plaintiff], Guarantor [Bracken] and Borrower [Patriot] in order to set forth the relative rights and priorities of Senior Agent . . . and Subordinated Creditor under . . . the Subordinated Credit Agreement.

Dkt. No. 43-3, Recital at D.  That language suggests that the "transaction" proposed by Erb and Elias when they contacted Plaintiff in New York was meant to include both the Intercreditor Agreement and the Mezzanine Agreement.

Erb and Elias make a series of other arguments that fail.  They challenge various emails that Plaintiff submitted in support of its opposition brief, arguing that "many" of them are not related to the Mezzanine Loan at all, Dkt. No. 40 at 5, and instead relate to separate transactions considered by Plaintiff and Congressional Bank that did not result in the execution of any contracts, Dkt. No. 39 ¶ 3.  They also argue that the email correspondence shows that every email from Plaintiff "was either authored by, or directed to" Cutler, who was Plaintiff's representative in Florida, and that Fernando in New York was only copied on the emails.  Dkt. No. 40 at 6.  Those arguments, however, ignore the allegations that Erb and Elias made several

phone calls to Fernando in New York and that these calls were to solicit Plaintiff's investment in Patriot and enter into the Mezzanine Agreement and Intercreditor Agreement.  *See* AC ¶¶ 3, 17, 49-50.  Moreover, Plaintiff has submitted that Erb and Elias knew that Fernando was the "senior most individual with decision making ability at North Fork" and "was the person that they had to negotiate with and finalize any business agreement," Dkt. No. 38-3 ¶ 28, and the email correspondence shows that Erb and Elias copied or included him on correspondence with Cutler.

Erb and Elias next argue that even if Congressional Bank did transact business in New York, Plaintiff's allegations go to Erb and Elias in their corporate capacities and not in their individual capacities.  Dkt. No. 40 at 6.  But *Kruetter* held that that "it is constitutionally permissible to subject an individual participating in a transaction in a foreign State to long-arm jurisdiction even though his contacts with the forum were made in a corporate capacity." *Kreutter*, 522 N.E.2d at 46 (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

Finally, the argument that Erb and Elias "did not know Plaintiff conducted any business in New York" is belied by the Intercreditor Agreement to which Congressional Bank was party that lists Plaintiff's address in New York and by Plaintiff's allegations, which are accepted for the purposes of this motion as true, that Erb and Elias contacted Fernando in New York.

The Court need not reach the arguments under Section 302(a)(3)(ii) given its finding of personal jurisdiction over Erb and Elias pursuant to Section 302(a)(1).

### B.    Christopher Bracken

Bracken argues that the Court lacks personal jurisdiction over him pursuant to N.Y. C.P.L.R. §§ 302(a)(1) and (a)(3) because he is not a New York resident, "has virtually no connection with the state of New York," "did not knowingly send correspondence to any representative of North Fork in New York," "did not sign any document in his individual capacity that would subject him to jurisdiction in New York," and "did not otherwise engage in

any business in New York." Dkt. No. 43 at 3-4. He further claims that he "had no reason to know where North Fork's John Fernando was located while reading email correspondence." *Id.* These arguments lack merit.

The primary allegations against Bracken state that after he was introduced to Plaintiff on March 29, 2018, he sent fraudulent monthly financial reports to Plaintiff in New York between November 1, 2018 and June 6, 2019—after the signing of the Mezzanine Agreement and Intercreditor Agreement—with the intent to convince Plaintiff that the financial health of Patriot was strong and thus avoid having Plaintiff claim Patriot was in default of its loan. AC ¶¶ 23, 25, 30, 51. Plaintiff also submits email correspondence from Bracken to Fernando and Cutler before the signing and during the negotiation of the Mezzanine Agreement and Intercreditor Agreement. *See* Dkt. No. 46-2.

Courts have "long taken a broad view as to what it means to 'transact business' in New York." *Porco v. Phoenix Bldg. Corp.*, 2019 WL 2210659, at *4 (S.D.N.Y. May 21, 2019); *see also Madden v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers*, 889 F. Supp. 707, 710 (S.D.N.Y. 1995) (citing cases). "The 'overriding criterion' in determining whether an entity 'transacts any business' in New York within the meaning of the statute is whether the entity 'purposefully avails itself of the privilege of conducting activities within New York.'" *Rosenblatt v. Coutts & Co. AG*, 750 F. App'x 7, 9-10 (2d Cir. 2018) (quoting *Paterno*, 23 N.E.3d at 993). The Second Circuit has identified four non-exclusive factors that bear on the determination in this regard:

(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [parties to that contract] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state."

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004).

First, Bracken, in his corporate capacity, has an ongoing contractual relationship with Plaintiff through the Mezzanine Agreement, and although Plaintiff is a Delaware limited liability company, its principal place of business is in New York.  Second, the Mezzanine Agreement was negotiated by phone and email so that these "communications had just as much connection to New York as to [Georgia]."  *Out of Blue Wholesale, LLC v. Pac. Am. Fish Co. Inc.*, 2019 WL 3997393, at *5 (E.D.N.Y. Aug. 23, 2019) (quoting *Roxx Allison Ltd v. Jewelers Inc.*, 385 F. Supp. 3d 377, 381 (S.D.N.Y. 2019)).  But after the agreement was negotiated, although Bracken did not visit New York, he sent allegedly fraudulent reports to Plaintiff in New York on which Plaintiff continued to rely, which weighs in favor of a finding of personal jurisdiction.  *See id.*; *see also* AC ¶ 30.  Third, both the choice of law clause and the forum-selection clause select New York.  Though not dispositive, that factor strongly weighs in favor of a finding of personal jurisdiction.  *See Sunward Elecs.*, 362 F.3d at 23 ("A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law.").  Fourth, the contract requires the parties to send notices to Plaintiff in New York and Patriot in Georgia.  Taken together, these factors weigh in favor of a finding that Bracken "purposefully availed" himself of the privilege of conducting activities within New York.

Plaintiff has also adequately alleged that the causes of action arise from these New York activities.  Plaintiff alleges that, to its detriment, it relied on those allegedly fraudulent financial reports in not declaring a default, thus causing Plaintiff financial injury.  AC ¶ 30.  The fraud count thus arises out of those activities because the reports sent to Plaintiff in New York themselves served to effect a fraud on Plaintiff.  *Cf. Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 27 (2d Cir. 2004) ("Although Section 302(a)(1) is typically invoked in breach of contract cases, it applies as well to actions in tort when supported by a sufficient showing of facts [to establish that the tort arose out of the relevant transaction].") (internal citations omitted).

Bracken makes several arguments in response.  First, he claims that the Court cannot assert personal jurisdiction over him because his dealings were in his capacity as CEO of Patriot.  But as established above, N.Y. C.P.L.R. § 302(a) does not shield from personal jurisdiction a defendant who engages in conduct in New York in his fiduciary capacity.  *See Kreutter*, 522 N.E.2d at 47; *see Arch Specialty Ins. Co. v. Entm't. Specialty Ins. Servs., Inc.*, 2005 WL 696897, at *4 (S.D.N.Y. Mar. 24, 2005) ("The court in *Kreutter* held that 'the fiduciary shield rule is not available to defeat jurisdiction under the New York long-arm statute' and did not leave room for any exceptions.") (citation omitted).  "In order to establish jurisdiction over an individual for conduct performed in a corporate capacity, a plaintiff need only establish that the principal engaged in purposeful activities in the forum state on behalf of the corporation, with the corporation's knowledge and consent, and subject to the corporation's control."  *Wallace Church*, 2020 WL 4369850, at *6.  The Amended Complaint satisfies the standards set out in *Kreutter*.  It alleges that Bracken, who was the CEO of Patriot and who signed the Mezzanine Agreement on its behalf, sent the monthly collateral reports to Plaintiff in New York as part of his regular responsibilities and Patriot's obligation.

Second, Bracken argues that he did not travel to New York to engage in business dealings; all of the in-person discussions with Plaintiff occurred in Georgia, and Bracken's primary point of contact was Plaintiff's representative Cutler who was located in Florida. Dkt. No. 43 at 18. Those arguments fail to take seriously the law of New York. The genius, and purpose, of Section 302(a)(1) is that it subjects to personal jurisdiction in New York a defendant who may never physically enter New York himself but who sends communications into the state by email, telephone, facsimile, or other remote communications. That is particularly important as "[t]he 'advent of the internet' has of course created 'a new set of challenges' regarding personal jurisdiction." *DH Servs., LLC v. Positive Impact, Inc.*, 2014 WL 496875, at *6 (S.D.N.Y. Feb. 5, 2014) (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000)).

Bracken's argument also fails to take seriously the allegations of the Amended Complaint and the evidence which the Court construes "in the light most favorable" to Plaintiff at this stage. *Dorchester Fin. Sec.*, 722 F.2d at 85. Although Bracken argues he dealt "almost exclusively" with Cutler in Georgia, the emails submitted by Plaintiff suggest differently, and importantly, New York law instructs that it is the "quality" of the communications and not their quantity that dictates jurisdiction. *See Fischbarg*, 880 N.E.2d at 26-27. The fact that under the Mezzanine Agreement, which Bracken signed as CEO of Patriot, notice was to be given to Fernando at Plaintiff's office in New York disposes of Bracken's conclusory argument that he did not know where Fernando was located.

Third, Bracken argues that the "center of gravity" of the Mezzanine Agreement was well outside the state of New York. Dkt. No. 43 at 11. He relies on a line of cases that say, that in the context of a contract negotiation, "where a defendant's contacts with New York consist of

telephone calls, fax transmissions, and correspondence in connection with the negotiation of a contract that has a center of gravity well outside the state, there is no personal jurisdiction under C.P.L.R. § 302(a)(1)." *DirecTV Latin Am.*, 691 F. Supp. 2d at 420 (center of gravity for joint venture agreement to create TV channel in Latin America was outside of New York). *DirecTV Latin America* is inapposite. There, the purpose of the contract was to broadcast a channel in Latin American countries; thus, no part of the contract was to take place in New York. Here, the agreements do not concern a sale of goods or development of a product that will take place in a particular location. The "center of gravity" of the contract is at least in New York, the location of the lender and loan, but perhaps Georgia, the location of the borrower, could also be a center of gravity. Moreover, the allegations made against Bracken include actions he took after the signing of the contract, such as sending the fraudulent monthly statements to Plaintiff in New York. His contact with New York is thus not a "temporary and tangential contact," but rather "a sustained and purposeful connection to the forum state." *Id.* at 421; *see Roxx Allison*, 385 F. Supp. 3d at 383 ("[T]his case does not involve an isolated transaction, nor was the defendant unaware of plaintiff's location. Defendant entered this relationship with eyes open. Proceeding in this forum will work no grave injustice.").[4]

Finally, Bracken argues that a finding of personal jurisdiction in New York would render illusory the "consent to jurisdiction" provision of the Intercreditor Agreement among Plaintiff, Bracken, Patriot, and Congressional Bank, pursuant to which Plaintiff agreed that Maryland would have exclusive jurisdiction over any dispute "ARISING OUT OF OR RELATING TO

---

[4] At least one court in this District "is no longer persuaded that the 'center of gravity' test reflects the law as it is applied by New York courts" as "the phrase seems to appear in New York State court decisions only in the context of choice-of-law analysis, not personal jurisdiction." *Roxx Allison*, 385 F. Supp. 3d at 382.

THIS AGREEMENT, ANY OF THE SUBORDINATED CREDIT DOCUMENTS OR ANY OF

THE LOAN DOCUMENTS IN ANY ACTION OR PROCEEDING."  Dkt. No. 43-3, Section

18.  The law is clear, however, that "[a] defendant has no power to immunize himself from

personal jurisdiction by inserting a mandatory forum selection clause in a contract."  *Arch

Specialty*, 2005 WL 696897, at *3.  In the first instance, the forum-selection clause goes to

venue; it does not deprive a court of personal jurisdiction.  *See, e.g.*, *id.*; *see also New Moon

Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 28 (2d Cir. 1997) ("[W]e have long

recognized that parties have no power by private contract to oust a federal court of jurisdiction

otherwise obtaining.").  Moreover, contrary to Bracken's argument, the exercise of personal

jurisdiction in New York does not deprive the forum selection clause of meaning.  Maryland still

has jurisdiction over disputes arising out of or relating to the Intercreditor Agreement.  Bracken

has not argued that this dispute falls within that language and Maryland does not have exclusive

jurisdiction of claims entirely independent of the agreement.  *See C. Mahendra (N.Y.), LLC v.

Nat'l Gold & Diamond Ctr., Inc.*, 3 N.Y.S.3d 27, 30 (1st Dep't 2015).

    That is not the end of the analysis, however, as a "plaintiff must establish the court's

jurisdiction with respect to each claim asserted."  *Sunward Elecs.*, 362 F.3d at 24; *see also

Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018).  For the fraudulent

conveyance claim, Bracken is not subject to personal jurisdiction pursuant to N.Y. C.P.L.R.

§ 302(a)(1) because the contacts that provide Section 302(a)(1) jurisdiction over Bracken with

respect to the fraud claim (*i.e.*, the monthly collateral reports and email correspondence before

and after the signing of the agreements) do not apply to the fraudulent conveyance claim and

Bracken does not reside or work in New York.

Plaintiff has also failed to assert a basis for personal jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii) because it has failed to plead any facts supporting the fifth element: that "defendant derived substantial revenue from interstate or international commerce." *Penguin Grp.*, 946 N.E.2d at 162. Courts have declined to decline to impute a corporation's substantial revenue from interstate or international commerce to the corporation's non-shareholding officers. *See, e.g.*, *Pincione v. D'Alfonso*, 2011 WL 4089885, at *10 (S.D.N.Y. Sept. 13, 2011), *aff'd*, 506 F. App'x 22 (2d Cir. 2012) ("[I]f a corporation derives substantial revenue from interstate or international commerce, that revenue cannot be imputed to the company's non-shareholding officers."); *Siegel v. Holson Co.*, 768 F. Supp. 444, 446 (S.D.N.Y. 1991) (declining to impute revenues to president for jurisdictional purposes because he was a non shareholding officer of the corporation). Where, however, a defendant is a major shareholder or owner in the corporation, courts may attribute the corporation's revenues to the defendant on the theory that there is "no convincing reason why the mere fact of corporate employment should alter the jurisdictional calculus." *Kreutter*, 522 N.E.2d at 46 (citation omitted); *see Related Cos., L.P. v. Ruthling*, 2017 WL 6507759, at *6 (S.D.N.Y. Dec. 18, 2017) (attributing corporation's revenue to 100% stockholder); *Facit, Inc. v. Krueger, Inc.*, 732 F. Supp. 1267, 1273-74 (S.D.N.Y.1990) (attributing revenues to defendants who owned most of company stock for whom they were employed).

Bracken is alleged to be the former CEO, director, and member of Patriot, which is an LLC. "[A]s [a] member[] of . . . a limited liability corporation [Bracken] share[s] in the profits and losses of the corporation and so stand[s] to benefit from the transactions underlying the complaint." *Wallace Church*, 2020 WL 4369850, at *8. However, there are no allegations as to Patriot's revenues, Bracken's share of Patriot's revenues, or Bracken's revenues (in his

individual capacity), whether substantial or not and whether derived from interstate or international commerce.  The absence of any kind of pleading with respect to this element causes Plaintiff's arguments under Section 302(a)(3)(ii) to fail.  *See Related Cos.*, 2017 WL 6507759, at *7 ("To determine whether revenue is substantial, courts look either to the percentage of a party's overall revenue derived from interstate commerce, or to the absolute amount of revenue generated by a party's activities in interstate commerce, with each case to be decided on its own facts.").

However, Plaintiff can invoke the doctrine of pendent personal jurisdiction to assert personal jurisdiction over Bracken on the fraudulent conveyance claim.  That doctrine provides that "where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 88 (2d Cir. 2018) (quoting *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993)).  While the traditional application of pendent personal jurisdiction applies when the anchor claim is federal and the pendent claim is a state law claim, the "Second Circuit has endorsed extending the doctrine to instances where both the anchor and pendent claims are state law claims."  *Truck-Lite Co., LLC v. Grote Indus., Inc.*, 2019 WL 3714599, at *7 (W.D.N.Y. Apr. 2, 2019); *see Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 719 (2d Cir. 1980); *see also Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 438 (2d Cir. 2008).  "[T]he determination to exercise pendent jurisdiction is an act of discretion."  *Gen. Star Indemn. Co. v. Anheuser-Busch Cos., Inc.*, 199 F.3d 1322, 1999 WL 1024708, at *2 (2d Cir. 1999) (summary order).

The fraud claim concerns Bracken's statements made during the negotiation of the agreements and the monthly fraudulent collateral reports, and alleges that Bracken—along with Henagan and Spencer—altered the monthly collateral reports to hide that they were stealing assets from Patriot and conveying them to themselves and also to hide Patriot's true financial condition.  AC ¶ 79.  The fraudulent conveyance claim is thus derived from the same "common nucleus of operative fact": the collateral reports were fraudulent because they misrepresented Patriot's financial condition, which Defendants allegedly knew because they were siphoning its assets.  The evidence and witnesses would likely be the same to establish liability.  Since the fraudulent conveyance claim is "based on the same factual predicate as the" fraud claim, the Court exercises its discretion to hear both claims.  *Hanly*, 290 F. App'x at 438.[5]

### C.  Henagan and Spencer

Plaintiff alleges that Bracken, Henagan, and Spencer "fraudulently represented Patriot LLC's financial status with false reports and emails sent from their headquarters in Georgia, to Plaintiff's offices in New York to transact business in the State."  AC ¶ 7; *see also id.* ¶ 24 ("Bracken, Henagan and Spencer sent financial reports directly to Plaintiff in New York as part of their company's responsibility [and] also engaged in business communications by calling the representatives of Plaintiff and discussing business in New York.").  It further alleges that Henagan sent updated collateral reports containing "incorrect and fraudulent data" on August 3

---

[5] The fraudulent conveyance claim also includes actions taken by Patriot such as overpaying Cooney, AC ¶¶ 89-91, and unnecessarily paying "third parties and unsecured creditors," *id.* ¶¶ 96-99, with funds that "should have been set aside for the payment of the loan issued by the Plaintiff," *id.* ¶ 118.  That those acts are part of the same "common nucleus" as the fraud claim is doubtful, as they occurred after the discovery of the alleged fraud and relate to different transfers for different reasons, but the Court need not split the fraudulent conveyance claim into two as "the federal interest in avoiding duplicative litigation by disposing of an entire controversy in one proceeding outweigh[s] any marginal impingement on state concerns."  *Hargrave*, 646 F.2d at 721.  Moreover, those allegations fail to state a claim as described below.

and 5, 2019, and thereafter on multiple occasions." *Id.* ¶ 26.  For the same reasons it found

personal jurisdiction over Bracken, the Court holds that the allegations are sufficient at this stage

to support personal jurisdiction over Henagan and Spencer on the fraud claims under N.Y.

C.P.L.R. § 302(a)(1) and on the fraudulent conveyance claims through pendent personal

jurisdiction.

Henagan and Spencer's arguments fail for the same reasons that Bracken's arguments

fail.  It is irrelevant under Section 302(a) that "Plaintiff does not allege that Henagan or Spencer,

acting as individuals, as opposed to acting as corporate officers, ever transacted any business in

New York." Dkt. No. 45 at 12.  New York has done away with the "fiduciary shield" doctrine

for personal jurisdiction and permits personal jurisdiction over an individual for conduct

performed in a corporate capacity.  *See Kreutter*, 522 N.E.2d at 44-45; *see also Ramiro Aviles v.*

*S & P Glob., Inc.*, 380 F. Supp. 3d 221, 261 (S.D.N.Y. 2019) ("[I]f a corporation has sufficient

in-state contacts to fall subject to personal jurisdiction, then a corporate officer who has "played

a part in the [corporate] activities that gave rise to the action" is likewise subject to

jurisdiction.").

Henagan and Spencer also argue that Plaintiff does not allege the precise dates that the

financial reports were sent and also alleges that Bracken—and not they—authored the allegedly

fraudulent reports.  Dkt. No. 45 at 13.  But that argument simply ignores the language of the

Amended Complaint that Henagan and Spencer approved the fraudulent reports sent by Bracken

and that Henagan himself also sent updated fraudulent reports in August 2019.  AC ¶¶ 26, 64.

Moreover, allegations of personal jurisdiction, unlike allegations of fraud, need not be plead with

particularity under Fed. R. Civ. P. 9(b).

Finally, Henagan and Spencer attack a strawman when they assert that the forum-selection clause in the Mezzanine Agreement binds Patriot but not them.  Dkt No. 45 at 13-14.  As with its allegations to Bracken, Plaintiff need not rely on the forum-selection clause to assert that there is personal jurisdiction over Henagan and Spencer.

### D.      Federal Due Process

"In order to satisfy the Due Process Clause of the United States Constitution, the exercise of long-arm jurisdiction by New York must be based on defendants' 'minimum contacts' with the state and must comport with 'traditional notions of fair play and substantial justice.'" *Agency Rent A Car Sys.*, 98 F.3d at 32 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Where specific jurisdiction is found, minimum contacts exist "where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels*, 305 F.3d at 127.  "Once a plaintiff has made a threshold showing of minimum contacts, the defendant must come forward with a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir. 2000), *cert. denied*, 532 U.S. 941 (2001)).

For the reasons stated above, Plaintiff has demonstrated Defendants' minimum contacts with New York.  By reaching out to Plaintiff in New York to persuade it to invest in Patriot and by continuing to send monthly collateral reports to Plaintiff in New York, Defendants purposefully availed themselves of doing business in New York and should have foreseen the prospect of being sued here.  *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 243 (2d Cir. 1999).  As to whether the exercise of personal jurisdiction is reasonable, there are five factors to consider:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.* at 244 (citing *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113-14 (1987)).

The first factor slightly weighs in favor of Defendants, the second and third factors weigh in favor of Plaintiff, the fourth and fifth factors are neutral.

With respect to the first factor, Defendants Bracken, Henagan, and Spencer are located in Georgia and Defendants Erb and Elias are located in Maryland. However, "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago" and thus, while the first "factor cuts slightly in favor of the defendant in the instant case, we recognize that, taken alone, it falls short of overcoming the plaintiff's threshold showing of minimum contacts." *Metro. Life Ins.*, 84 F.3d at 574. As to the second factor, Plaintiff has an interest in keeping this case within the forum state as its principal place of business is New York, and Fernando, the "senior most individual with decision making ability at North Fork" and "the person that they had to negotiate with and finalize any business agreement," is based in New York. Dkt. No. 38-3 ¶ 28. As for the third factor, Plaintiff correctly notes that "New York has an interest in providing a forum for one of its residents who was injured while within the state, and who would be entitled to rely upon the application of New York law." Dkt. No. 38 at 16. The fourth factor evaluates "where witnesses and evidence are likely to be located." *Metro. Life Ins.*, 84 F.3d at 574. Defendants have not argued where such witnesses and documentary evidence would be. While it is likely that the majority of documentary evidence would be at Patriot's office in Georgia, the action will still require evidence and witnesses from Maryland and from Plaintiff's principal place of business in New

York.  Moreover, the "alterative to adjudication of the entire dispute in New York would be the inefficient holding of separate trials" in other states.  *Kernan*, 175 F.3d at 245; *see also Del Ponte v. Universal City Dev. Partners, Ltd.*, 2008 WL 169358, at *12 (S.D.N.Y. Jan. 16, 2008). Finally, the fifth factor is neutral as neither party has suggested any substantive social policies that would be furthered by permitting the case to be heard in New York or elsewhere.

Defendants have not come forward with any case, compelling or otherwise, as to why subjecting them to jurisdiction in this Court would not comport with due process principles. Accordingly, the Court finds that the exercise of personal jurisdiction over Defendants would not offend "traditional notions of fair play and substantial justice."  *Int'l Shoe*, 326 U.S. at 316.

## II.    Motions to Dismiss for Failure to Plead with Particularity and to State a Claim

A claim for fraud is subject to the particularity requirements of Fed. R. Civ. P. 9(b).  A plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent; (2) identify the speaker; (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *see Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (to plead fraud with particularity, a complaint must "specify the time, place, speaker, and content of the alleged misrepresentations" and "should explain how the misrepresentations were fraudulent").  Allegations that are "conclusory and unsupported by assertions of fact" are not sufficient to meet the Rule 9(b) standard.  *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986).

Plaintiff alleges the following statements were fraudulent:

(1) statement by Erb and Elias on March 28, 2018 that "Patriot's financial condition was excellent" and "lending to Patriot was a good opportunity for Plaintiff" when in fact they both knew that Patriot was in default, AC ¶¶ 17, 49-50;

(2) statements by Erb and Elias throughout April and May 2018 that "represent[ed] the good financial health of Patriot and how this would be a great business deal for Plaintiff" and that "[they] were doing everything to help Patriot grow and saw great potential for Patriot," *id.* ¶ 52;

(3) omissions by Erb and Elias that "failed to inform the Plaintiff that Patriot and [Bracken, Henagan, and Spencer] were submitting fraudulent collateral reports to the Plaintiff and they stated that 'the collateral was performing well,'" *id.* ¶ 55;

(4) the monthly collateral reports sent by Bracken and approved by Henagan and Spencer that contained fraudulent information, *id.* ¶¶ 63-64, 68;

Each of these allegations suffers from a different deficiency but altogether, Plaintiff has failed to plead when each fraudulent statement was made, which statements were fraudulent, or why they were fraudulent.  For example, Plaintiff does not identify: the dates of statements made "throughout April and May 2018"; the dates of omissions made by Erb and Elias; the dates of the monthly collateral reports; and the statements within the monthly collateral reports that were false and that would also indicate why Patriot's financial condition was not "excellent."  Plaintiff also alleges that Erb emailed Plaintiff on March 29, 2018, and that "Erb and Elias sent another 30 emails to Plaintiff's representatives overseeing the mezzanine loan process and the intercreditor agreement" but fail to say whether all or any of these emails contained misstatements or omissions, and what those misstatements or omissions entailed.  *Id.* ¶¶ 51, 57.

However, contrary to Bracken's argument, Plaintiff pleads scienter for the fraud claims. It alleges that the monthly collateral reports were fraudulent because the August 2019 collateral report indicated a "substantial increase in the number of collateral loans that were between 60-90 days delinquent," which was "much greater than the loans that were 30-60 days delinquent in the immediately prior month, a mathematically impossibility based upon the passage of time." *Id.* ¶ 68.  Because "the number of delinquent loans in the August 2019 report was greater than

expected," Plaintiff alleges that "upon information and belief, the reports had been fraudulent for months." *Id.* ¶ 76.  Plaintiff further alleges that the "loans that were now being reported with delinquency status of more than one month delinquent had not been reported delinquent in the prior report," *id.* ¶ 78, and that this "discovery of the concealment of the nature and length of delinquent loans contradicted the former representations in the reports," *id.* ¶ 79.  Moreover, "[a]fter discovery of the discrepancy, the portfolio began suffering greater delinquencies and defaults than it ever had before." *Id.* ¶ 80.  Plaintiff alleges that it tried to obtain information on the collateral reports and thus Patriot's true financial condition, but when questioned about the reports, Henagan and Spencer denied knowledge of their contents, failed to provide information regarding the reports, diverted the issue of the discrepancies, and sought Congressional Bank's involvement to stop Plaintiff from further inquiring.  *Id.* ¶¶ 73-74.  Yet Bracken, Henagan, and Spencer had been directly responsible for creating, approving, and/or distributing the reports to Plaintiff.  At the pleading stage, those allegations are sufficient to "give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Caputo*, 267 F.3d at 191; *see also Herman v. Herman*, 2020 WL 2086193, at *4 (S.D.N.Y. Apr. 30, 2020) ("A strong inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'") (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Plaintiff's claims under New York Debtor and Creditor Law § 273 fail for a different reason.  Section 273 provides that "[e]very conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made . . . without a fair consideration."  N.Y. Debt. & Cred. Law § 273.  The

primary remedy for any fraudulent conveyance is avoidance, which permits a plaintiff creditor to recover the transferred assets from the third-party recipient.  If the recipient has since "spent or dissipated the property conveyed," N.Y. C.P.L.R § 5225(b) "furnishes a mechanism for obtaining [an equivalent] money judgment against the recipient." *F.D.I.C. v. Conte*, 612 N.Y.S.2d 261, 262 (3d Dep't 1994).  Under New York law, "a person challenging a transfer of the debtor's property as constructively fraudulent . . . must show that [the transfer] was made without fair consideration and [] the debtor was insolvent or was rendered insolvent by the transfer." *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, 2013 WL 5366373, at *9 (S.D.N.Y. Sept. 25, 2013) (citing N.Y. Debt. & Cred. Law § 273); *see also Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 400 (S.D.N.Y. 2015), *aff'd*, 716 F. App'x 23 (2d Cir. 2017) ("Under DCL § 273, a conveyance is constructively fraudulent if it lacks 'fair consideration' and the debtor 'is or will be thereby rendered insolvent.'").  "[F]air consideration exists where the transferor, in good faith, receives 'fair equivalent' property or a similarly equivalent antecedent debt is discharged." *Murray Eng'g P.C. v. Remke*, 2018 WL 3773991, at *16 (S.D.N.Y. Aug. 9, 2018); *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005) (The "fair consideration test" states that: "[i] the recipient of the debtor's property must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and [ii] such exchange must be a fair equivalent of the property received; and [iii] such exchange must be in good faith.").  Section 273 is defined without regard to the debtor's intent in making the transfer.  *See, e.g.*, *Murray Eng'g*, 2018 WL 3773991, at *16.  As with the fraud claim, "[a]ctual or constructive fraudulent conveyance claims must satisfy Rule 9(b)." *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 442 (S.D.N.Y. 2019); *see also Sesa, Inc. v. Terrafina*, 2020 WL 6382919, at *3 (S.D.N.Y. Oct. 30, 2020) (citing cases).

Plaintiff brings two sets of allegations under Section 273.  The first set alleges that

Bracken—along with Henagan and Spencer—altered the monthly collateral reports to hide that

they were conveying assets from Patriot to themselves as direct beneficiaries.  AC ¶ 79.  The

second set alleges that Patriot overpaid Cooney, *id.* ¶¶ 89-91, and unnecessarily paid "third

parties and unsecured creditors," *id.* ¶¶ 96-99, with funds that "should have been set aside for the

payment of the loan issued by the Plaintiff," *id.* ¶ 118.  Plaintiff's fraudulent conveyance claim

based on the first set of allegations survives, but fails as to the second set of allegations.

For the first set, Plaintiff alleges that Patriot received no consideration for the

conveyances to Bracken, Henagan, and Spencer, and as a result of these conveyances, by

September 2019, Patriot had become insolvent and unable to pay its creditors to satisfy their loan

demands.  AC ¶ 86.  To support that Patriot had become insolvent, Plaintiff alleges that Patriot

had hired Cooney to find buyers for Patriot's collateral so that it could pay its creditors.  *Id.*

Although Plaintiff does not "specify the property that was allegedly conveyed, the timing and

frequency of those allegedly fraudulent conveyances, or the consideration paid," those

particulars are peculiarly within the knowledge of Defendants and may be pled upon information

and belief.  *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d

198, 221 (S.D.N.Y. 2002) (Lynch, J.).  Significantly, and as noted above, Plaintiff tried to obtain

information on the collateral reports, which would help to confirm the conveyances, but Henagan

and Spencer blocked such efforts.  AC ¶¶ 73-74.  These allegations are sufficient to state a claim.

*See, e.g.*, *Sesa*, 2020 WL 6382919, at *4; *SungChang Interfashion*, 2013 WL 5366373, at *10.

However, Plaintiff failed to plead the fraud claims with particularity and those fraud claims were

the basis for this Court's exercise of pendent personal jurisdiction over Bracken, Henagan, and

Spencer on the fraudulent conveyance claim.  Because Plaintiff does not adequately plead a

claim of fraud, the Court cannot exercise pendent personal jurisdiction over the fraudulent conveyance claim.

As to the second set, Plaintiff does not allege that Bracken, Henagan, and Spencer were beneficiaries, transferors, or transferees of the conveyances.  "New York law does not recognize 'a creditor's remedy for money damages against parties who . . . were neither transferees of the assets nor beneficiaries of the conveyance.'"  *Roselink Invs., L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 226–27 (S.D.N.Y. 2004) (quoting *F.D.I.C. v. Porco*, 552 N.E.2d 158, 159 (1990)). Plaintiff therefore cannot succeed on its fraudulent conveyance claim against them unless it alleges facts sufficient to support a corporate veil-piercing theory.  *See, e.g.*, *SungChang Interfashion*, 2013 WL 5366373, at *11-12 (permitting fraudulent conveyance claims against individual executive of corporation to proceed based on veil-piercing theory).  Plaintiff has alleged only in conclusory terms that Henagan, Spencer, and Bracken "abused the corporate form to make payments for unnecessary third party expenses and the costs of Rooney," AC ¶ 118, but this does not meet the "heavy burden" required to pierce the corporate veil, *TNS Holdings v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (1998).  Specifically, a "plaintiff seeking to pierce the corporate veil must demonstrate that a court in equity should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue and, in doing so, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the plaintiff."  *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 798 (S.D.N.Y. 2017) (quoting *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 884 N.Y.S.2d 94, 98 (2d Dep't 2009)).  "Factors to be considered in determining whether the owner has abused the privilege of doing business in the corporate form include whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets,

and use of corporate funds for personal use." *E. Hampton Union Free Sch. Dist.*, 884 N.Y.S.2d at 99; *see also Sesa*, 2020 WL 6382919, at *4.  Plaintiff has not alleged any of those factors and has not included the recipients of the conveyances, Patriot, or Congressional Bank as defendants in this action.

## CONCLUSION

The motions to dismiss are GRANTED without prejudice.  Plaintiff will be given another opportunity to amend the complaint to include particularized allegations as to the fraud claims and if applicable, allegations to support a theory of corporate veil-piercing on the fraudulent conveyance claim.  If Plaintiff does not file an amended complaint within 30 days of this opinion, the Court will direct the Clerk to close this case.

The Clerk of Court is respectfully directed to close Dkt. Nos. 33, 41, 44.


SO ORDERED.


Dated: November 23, 2020
      New York, New York

                      LEWIS J. LIMAN
               United States District Judge