UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                     :

NORTH FORK PARTNERS INVESTMENT     :
HOLDINGS, LLC,
                                     :

                  Plaintiff,       :           20-cv-2444 (LJL)

                                     :

             -v-                  :         <u>OPINION AND ORDER</u>

                                     :

W. CHRISTOPHER BRACKEN, *et al.*,      :

                                     :

                 Defendants.     :

-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff North Fork Partners Investment Holdings, LLC ("Plaintiff" or "North Fork")

initiated a lawsuit against defendants W. Christopher Bracken, William Henagan, Richard

Spencer, Kenneth Elias, and Christopher Erb (collectively, "Defendants") related to a mezzanine

loan to Patriot LLC ("Patriot"). Defendant Bracken moves for summary judgment as to the

single claim for fraud against him, Dkt. No. 127, defendants Elias and Erb move for summary

judgment as to the single claim for fraud against them, Dkt. No. 122, and defendants Henagan

and Spencer move for summary judgment as to the claims for fraud and fraudulent transfers

against them, Dkt. No. 132.

      For the following reasons, the motions for summary judgment are granted.

## BACKGROUND

      The following facts, which are largely drawn from the parties' Local Rule 56.1

statements of facts, Dkt. Nos. 124, 128, 133, 140-1, 142-1, 143-1, are undisputed unless

otherwise indicated and are construed in favor of the non-moving party.

Plaintiff is a Delaware limited liability company.  Dkt. No. 140-1 ¶ 4.  Plaintiff's Managing Director is Noah Cutler and its principal is John Fernando.  Dkt. No. 143-1 ¶ 7; Dkt. No. 140-1 ¶ 21.

The present matter relates to a mezzanine loan that Plaintiff provided to Patriot.  Patriot was in the business of making consumer loans to private individuals in Georgia that met certain creditworthiness criteria.  Dkt. No. 140-1 ¶ 6; Dkt. No. 143-1 ¶ 1.  Henagan and Spencer were two members of Patriot's three-member board of managers.  Dkt. No. 143-1 ¶ 2.  The third Manager was Bracken, who was the Chief Operating Officer of Patriot.  *Id.*; *see also* Dkt. No. 140-1 ¶ 3; Dkt. No. 142-1 ¶ 7.

On or about December 18, 2017, Patriot and Congressional Bank ("Congressional") entered into a Loan and Security Agreement, pursuant to which Congressional agreed to provide a credit line to Patriot of $6,500,000 at an interest rate of approximately 5.7% (the "Congressional Loan").  Dkt. No. 140-1 ¶ 9; Dkt. No. 143-1 ¶ 4.  Erb and Elias were officers of Congressional.  Dkt. No. 140-1 ¶ 1; Dkt. No. 143-1 ¶ 4.  Congressional's loan facility had an advance rate of 72.50% of the outstanding principal balance on eligible receivables, requiring Congressional to fund 72.50% of the principal balance of Patriot's eligible loans to consumers.  Dkt. No. 140-1 ¶ 11.  Patriot sent monthly collateral reports to Congressional as required under the Congressional Loan.  Dkt. No. 142-1 ¶ 69.  Goldpoint was the loan servicing system Patriot used, and the data for Patriot's monthly reports came from this system.  *Id.* ¶ 70.

During a March 28, 2018 phone call, Fernando and Cutler discussed Patriot with Erb.  Dkt. No. 140-1 ¶ 24.  There is no evidence that Elias participated in the call.  *Id.* ¶¶ 27–28.  Plaintiff claims that during the phone call, Erb stated to Fernando and Cutler that "there was a great opportunity to invest in Patriot."  *Id.* ¶ 33.

2

Erb introduced Plaintiff to Patriot via email on or about March 28, 2018.  Dkt. No. 140-1 ¶ 11.  An introductory phone call between Plaintiff and Patriot occurred within a week of this email.  Dkt. No. 142-1 ¶ 14.  Elias and Erb were not part of this phone call.  *Id.* ¶ 15.  After the introduction, Plaintiff and Patriot proceeded to exchange emails about Plaintiff providing a loan to Patriot; neither Erb, Elias, nor anyone else from Congressional were included on the emails. Dkt. No. 140-1 ¶ 37.

In connection with potentially providing a loan to Patriot, Plaintiff conducted due diligence, although the parties dispute whether it was Plaintiff's normal due diligence.  Dkt. No. 140-1 ¶¶ 39–40; Dkt. No. 142-1 ¶ 19, 33.  Patriot gave Plaintiff everything it asked for in its due diligence requests.  Dkt. No. 142-1 ¶ 19.  North Fork received data on Patriot's actual finances through May 31, 2018, and forecasted financial data through the closing.  *Id.* ¶ 27.  No one from Plaintiff asked for monthly financial forecasts from before May 31, 2018, although Plaintiff notes that this was because it was unaware that those earlier forecasts existed.  *Id.* ¶ 30.

Plaintiff ultimately closed on a $650,000 mezzanine loan to Patriot on August 3, 2018, with an interest rate of 18% per annum (the "North Fork Loan").  Dkt. No. 140-1 ¶ 38; Dkt. No. 143-1 ¶ 5.  The North Fork Loan advance rate was 12.5%.  Dkt. No. 142-1 ¶ 49.  With the advance rates of 72.5% and 12.5% between the Congressional Loan and North Fork Loan, Patriot used debt financing for 85% of its loans and was responsible only for funding the remaining 15% itself.  *Id.* ¶ 50.  Congressional and Plaintiff were sources of capital used to fund part of every loan Patriot made.  *Id.* ¶ 51.  As a mezzanine loan, the North Fork Loan was subordinate to the Congressional Loan.  *Id.* ¶ 78.

On or about the date of the closing on the North Fork Loan, Plaintiff learned that Patriot was in default under the Congressional Loan, although Plaintiff contends that the default was

improperly characterized as a minor technical default by Erb.  Dkt. No. 140-1 ¶ 62.  Patriot's default concerned a negative covenant governing the extent of permitted adjusted net income losses.  *Id.* ¶ 65.  Congressional reviewed the default and determined that it would agree to waive the default, although the parties dispute exactly why Congressional agreed to waive it.  *Id.* ¶ 66.  Congressional circulated the proposed Waiver of Default to both North Fork and Patriot on August 3, 2018.  *Id.* ¶ 67.  Prior to August 3, 2018, North Fork never asked Erb or Elias about the status of the Congressional Loan.  *Id.* ¶ 68.

North Fork was represented by counsel, Nelson Mullins, on the date of the closing on the North Fork Loan.  *Id.* ¶ 71.  North Fork reviewed Congressional's proposed Waiver of Default and North Fork signed off on the waiver, with North Fork's counsel writing "We're signed off on the amendment and waiver"; North Fork, however, notes that it only signed off because of "the false statements and material omissions of Erb."  *Id.*  The Waiver of Default was incorporated into the North Fork Loan.  *Id.* ¶ 73.  Nothing prevented Plaintiff from delaying closing on the North Fork Loan beyond August 3, 2018.  *Id.* ¶ 76.

Pursuant to the North Fork Loan, Patriot sent to Plaintiff copies of the same monthly collateral reports it sent to Congressional.  Dkt. No. 143-1 ¶ 10.  The last monthly report that Bracken sent to Congressional and/or North Fork was sent on or about July 12, 2019 (the "July 12 Report").  Dkt. No. 143-1 ¶ 23.  Bracken was terminated by Patriot on or about July 15, 2019 based upon the company's poor performance.  *Id.* ¶ 24; *see also* Dkt. No. 142-1 ¶¶ 72–73.  After Bracken's termination, Tim Harrelson was hired to serve as interim Chief Executive Officer ("CEO") of Patriot; however, he immediately became seriously ill and was unable to perform his duties of interim CEO of Patriot.  Dkt. No. 143-1 ¶ 25.

On or around August 5, 2019, another monthly report was sent to Congressional and Plaintiff from Patriot; the report reflected data as of July 31, 2019 (the "July 31 Report"). *Id.* ¶ 26. Henagan and Harrelson had to contact Bracken after his termination to get help with the format of the monthly report, having never prepared one previously. *Id.* ¶ 28. In order to prepare the July 31 Report, Henagan and Harrelson had to pull data from the Goldpoint system. *Id.* Henagan and Harrelson had no prior experience using the Goldpoint system and received little or no assistance with it. *Id.* The July 31 Report was sent in compliance with the Congressional Loan and North Fork Loan and not to seek additional loan amounts from Congressional or Plaintiff. *Id.* ¶ 29.

Cutler testified that he found "discrepancies" between the July 31 Report sent by Henagan and Harrelson and the July 12 Report that had been prepared and sent by Bracken. After analyzing the two reports, Cutler concluded that the contents of the July 31 Report were accurate and that the July 12, 2019 report was inaccurate. *Id.* ¶ 30. North Fork never fully investigated the discrepancies between the July 12 Report and the July 31 Report, and North Fork never completed a formal collateral audit. Dkt. No. 140-1 ¶ 104.

By July 2019, Patriot was unable to satisfy its loan obligations with Congressional and all borrowing against Congressional's line of credit ceased. Dkt. No. 143-1 ¶ 108. North Fork assisted in shopping Patriot's assets to third parties, but Patriot was unable to find a buyer. *Id.* ¶ 109. Pursuant to the Intercreditor Agreement between North Fork and Congressional, North Fork had the right to buy out Congressional's senior obligations prior to foreclosure on Patriot. *Id.* ¶ 118. North Fork considered, but opted not to exercise, its purchase rights under the Intercreditor Agreement. *Id.* ¶ 119.

Congressional foreclosed on Patriot's collateral in late-2019 or early-2020.  *Id.* ¶ 120.

Congressional administered the collateral and recovered its full principal plus some interest and

fees on the Congressional Loan.  *Id.* ¶ 121.  Patriot ceased business operations in 2020 because

of its unprofitability and was administratively dissolved by the Georgia Secretary of State on or

about October 22, 2020.  Dkt. No. 143-1 ¶ 33.  Plaintiff lost the entire amount of its loan plus

costs and expenses.  Dkt. No. 44 ¶ 3.

In 2018, Henagan Spencer Capital Partners ("HSCP") billed Patriot an annual

management fee of $50,000 for the management services that Henagan and Spencer rendered to

Patriot during 2018.  Dkt. No. 143-1 ¶ 16.  Patriot paid only two-thirds of the $50,000 amount

owing to HSCP for management services during 2018.  *Id.* ¶ 17.  In 2019, HSCP billed Patriot

$50,000 for the management services rendered to Patriot by Henagan and Spencer during 2019.

*Id.* ¶ 18.  Patriot Finance did not pay any portion of the 2019 management fee owing to HSCP.

*Id.* ¶ 19.

## PROCEDURAL HISTORY

On February 20, 2022, Plaintiff filed a complaint in the State of New York, County of

New York against Patriot, Bracken, Henagan, Spencer, Erb, and Elias.  Dkt. No. 1-1.  The case

was removed to the Southern District of New York on March 20, 2022 based on diversity

jurisdiction.  Dkt. No. 1.  Elias and Erb moved to dismiss the complaint for lack of personal

jurisdiction on March 27, 2020.  Dkt. Nos. 4–6.  The Court granted the motion to dismiss without

prejudice to Plaintiff filing an amended complaint.  Dkt. No. 17.  Plaintiff filed its first amended

complaint on June 19, 2020.  Dkt. No. 24.  All Defendants, except Patriot (which was not

served), moved to dismiss the first amended complaint on the basis of lack of personal

jurisdiction and failure to plead fraud with particularity.  Dkt. Nos. 30–33, 41–45.  On November

23, 2020, the Court granted the motion to dismiss without prejudice.  Dkt. No. 50.  Although the

Court held that it had personal jurisdiction over each of the Defendants, it held that Plaintiff had failed to state a claim against any defendant.  *Id.* at 35.

On December 23, 2022, Plaintiff filed a second amended complaint (the "Operative Complaint") against Bracken, Henagan, Spencer, Erb, and Elias.  Dkt. No. 55.  The allegations are in three parts:  First, Plaintiff alleges it was induced to make the loan by false representations by Erb and Elias.  Second, Plaintiff alleges that, after Plaintiff made the loan, Bracken, Henagan and Spencer submitted fraudulent financial reports to Plaintiff.  Third, Plaintiff alleges a scheme to divert Patriot's assets to Bracken, Henagan, and Spencer and to third parties.  *Id.*  The Operative Complaint asserts one claim for fraudulent transfers under New York Debtor & Credit Law § 273 against Henagan and Spencer.  *Id.* ¶¶ 138–51.  The Operative Complaint also asserts one count of fraud against Erb and Elias, *id.* ¶¶ 152–58, and one count of fraud against Bracken, Henagan, and Spencer, *id.* ¶¶ 159–65.

Defendants moved to dismiss the Operative Complaint.  Dkt. Nos. 56–64.

On September 9, 2021, the Court issued an Opinion and Order granting the motions in part and denying them in part.  Dkt. No. 71.  In a footnote, the Court noted that to "the extent that Plaintiff's second amended complaint seeks to assert a claim against Defendants for omissions rather than misrepresentations, Defendants' motions to dismiss are granted."  *Id.* at 5 n.2.  The Court noted that Plaintiff seemingly abandoned this claim in its briefing with respect to Erb and Elias, and, regardless, that the claim failed as there was no fiduciary duty between Defendants and Plaintiff.  *Id.*  The Court, however, found that Plaintiff had sufficiently pleaded fraud with particularity regarding Bracken sending certain of the monthly collateral reports to Plaintiff, *id.* at 6–8, and had sufficiently pleaded fraud with particularity regarding the submission of fraudulent reports to Plaintiff by Henagan and Spencer prior to the July 31 Report, *id.* at 8–10.

The Court noted that "for the [July 31 Report], Plaintiff alleges no factual basis for [its] belief that the Eligible Loans figure was still false.  Therefore, Plaintiff has failed to state a claim that the [July 31 Report]—or any subsequent report—was fraudulent."  *Id.* at 10.  With regard to the allegations against Erb and Elias, the Court sustained the complaint with regard to various alleged statements that the two made to Plaintiff including that "Patriot's financial conditions is excellent" and "[l]ending to Patriot would be a great opportunity [sic] North Fork Partners to make a profit."  *Id.* at 10–13.  The Court also granted in part and denied in part the fraudulent conveyance claim.  *Id.* at 16–17.

Discovery proceeded in the case.  On October 14, 2022, Elias and Erb filed a motion for summary judgment along with supporting documentation.  Dkt. Nos. 122–25.  On October 17, 2022, Bracken filed a motion for summary judgment along with supporting documentation, Dkt. Nos. 127–31, and Henagan and Spencer filed a motion for summary judgment along with supporting documentation.  Dkt. Nos. 132–35.  Plaintiff filed oppositions to each of the motions for summary judgment on October 7, 2022, along with supporting documentation.  Dkt. Nos. 140–43.  Elias and Erb, Bracken, and Henagan and Spencer filed reply memorandum of law in support of their motions for summary judgment on November 21, 2022, and Elias and Erb filed a declaration in support of their reply.  Dkt. Nos. 144–47.[1]

---

[1] Plaintiff also filed a complaint in the Supreme Court of the State of New York, County of New York on or about August 12, 2022 against Forbright Bank, Forbright, Inc., Patriot Finance LLC, and Henagan Spencer Capital Partners related to Plaintiff's investment in Patriot.  *See North Fork Partners Investment Holdings, LLC v. Forbright Bank et al.*, 22-cv-07060, Dkt. No. 1 (S.D.N.Y.).  On August 18, 2022, that case was removed to this Court.  *Id.*  On February 1, 2023, the Court granted a stay of all proceedings in that related action pending the Court's ruling on the motions for summary judgment in the present action.  *See Forbright Bank et al.*, 22-cv-07060, Dkt. No. 63.

## LEGAL STANDARD

### I. Summary Judgment

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-

moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).[2]

## II.   Fraud Claims

"To prove common law fraud under New York law, a plaintiff must show that: (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (quoting *PPI Enters., Inc. v. Del Monte Foods Co.*, 2003 WL 22118977, at *19 (S.D.N.Y. Sept. 11, 2003)); *see  Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996).

---

[2] The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

"At summary judgment as well as at trial, a plaintiff must prove each element of a fraud claim by 'clear and convincing' evidence." *Estrada v. Dugow*, 2016 WL 7017412, at *10 (S.D.N.Y. Nov. 30, 2016) (quoting *Century Pac., Inc.*, 528 F. Supp. 2d at 219); *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259–60 (2d Cir. 2021); *In re Refco Inc. Sec. Litig.*, 2013 WL 12158586, at *10 (S.D.N.Y. Aug. 7, 2013), *report and recommendation adopted*, 2014 WL 1302988 (S.D.N.Y. Mar. 19, 2014). "This evidentiary standard demands a high order of proof . . . and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *Century Pac., Inc.*, 528 F. Supp. 2d at 219 (quoting *Abrahami v. UPC Const. Co.*, 638 N.Y.S.2d 11, 13 (1st Dep't 1996)). "Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions." *Loreley Fin. (Jersey) No. 3 Ltd.*, 13 F.4th at 260 (citation omitted). Clear and convincing evidence, however, may be circumstantial. *Id.*

## DISCUSSION

Before the Court are three motions for summary judgment. Elias and Erb move for summary judgment as to the single claim for fraud against them, Bracken moves for summary judgment as to the single claim for fraud against him, and Henagan and Spencer move for summary judgment as to the claims for fraud and fraudulent transfers against them. The Court will address each of these motions in turn.

## I.    Elias and Erb

Elias and Erb move for summary judgment as to the single cause of action for fraud against them on the basis that Plaintiff has failed to produce any evidence that a fraudulent statement was ever uttered, that it relied on such a statement, or that it suffered proximately related damages. Elias and Erb note that while the Operative Complaint alleges a handful of

purportedly disputed statements, "[w]ith respect to Elias, Plaintiff did not identify a single allegedly false statement, and Plaintiff could not even recall whether Elias participated in the disputed conversation." Dkt. No. 125 at 13. Elias and Erb also note that the only evidence of any purportedly false statement made by Erb is that during a March 28, 2018 call, he stated that "there was a great opportunity [for North Fork] to invest in Patriot." *Id.* at 14. However, they contend that optimistic statements about the future of a company are only actionable if there is evidence that the holder of the opinion did not subjectively believe the statement when it was made and it was made with intent to deceive and that Plaintiff has presented evidence of neither. *Id.* at 15–19. Erb and Elias also note that Plaintiff may not save its claim by complaining about alleged omissions by Erb or new allegations related to an August 3, 2018 telephone call, as claims based on omissions were previously dismissed as a matter of law on the pleadings and the claims related to the August 3, 2018 telephone call were not pleaded in the Operative Complaint. *Id.* at 15–16. Elias and Erb further argue that Plaintiff cannot show that it relied on the alleged misrepresentation, as Plaintiff is a sophisticated investor and conducted extensive due diligence into Patriot and made its own calculated judgment about the risks and benefits of the loan transaction it ultimately entered, and Plaintiff cannot demonstrate loss causation. *Id.* at 19–24.

In arguing that the Court should deny summary judgment, Plaintiff notes that the record shows Erb made the statement that investing in Patriot was a good opportunity for North Fork and that Erb and Elias were aware that this statement was false and made it because their jobs were on the line and to induce North Fork to invest in Patriot. Dkt. No. at 140 at 16. Plaintiff also argues that the record further shows that Erb made another false statement on August 3, 2018 that Patriot's defaults and the associated waiver were minor and inconsequential and that Erb and Elias failed to disclose additional information necessary to render their original

statements not misleading.  *Id.* at 16–17.  Furthermore, Plaintiff argues that evidence supports

that Erb acted with scienter, that there exists a genuine issue of material fact as to the

reasonableness of Plaintiff's reliance on Erb's and Elias's misrepresentations and omissions, and

that Plaintiff suffered legally cognizable damages.  *Id.* at 19–22.

      To start, this Court rejects Plaintiff's argument that summary judgment should be denied

based on Erb's and Elias's fraudulent omissions.  In this Court's Opinion and Order on

Defendants' motions to dismiss, Dkt. No. 71, the Court granted each of Defendants' motions to

dismiss with respect to any claim against them for "*omissions* rather than misrepresentations."

*Id.* at 5 n.2 (emphasis in original).  The Court noted that not only did Plaintiff seemingly abandon

any claim based on omissions with regard to Erb and Elias, but such a claim also failed as a

matter of law as there "was no fiduciary duty between Erb and Elias and Plaintiff, as their

relationship arises solely out of the fact that they are both Plaintiff's creditors."  *Id.*  "Plaintiff did

not move to reconsider or move to file a [third] amended complaint to revive this theory."  *In re

Allergan PLC Sec. Litig.*, 2022 WL 17584155, at *21 (S.D.N.Y. Dec. 12, 2022).  "As 'summary

judgment is not a procedural second chance to flesh out inadequate pleadings,' Plaintiff cannot

now at the summary judgment stage reassert its claim" for fraud based on omissions.  *Id.*

(quoting *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 735 F. Supp. 2d 42,

82 (S.D.N.Y. 2010)).

      Plaintiff also may not base this fraud claim on Erb's allegedly false statement on

August 3, 2018 regarding Patriot's default.  This theory of fraud is not pleaded in the Operative

Complaint—a fact that Plaintiff does not appear to dispute.  *See* Dkt. No. 55; Dkt. No. 140.

Because "this new theory was not pled as required by Rule 9(b)," it is "therefore waived."  *Bank

of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 352 (S.D.N.Y. 2013); *S.E.C. v.*

*Lyon*, 605 F. Supp. 2d 531, 550 (S.D.N.Y. 2009) ("Fed. R. Civ. P. 9(b) requires a party alleging fraud to plead, with particularity, the circumstances constituting fraud or mistake.  Because the SEC did not plead this theory of fraud with particularity in its complaint, the Court will not consider it in resolving this motion."); *see also Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) ("Noting that the central purpose of a complaint is to provide the defendant with notice of the claims asserted against it.").

Accordingly, the Court will only consider, at this stage, whether there exists a disputed issue of material fact regarding Plaintiff's claim for fraud on the basis of Erb's statement during a March 28, 2018 call that "there was a great opportunity [for North Fork] to invest in Patriot." Dkt. No. 140-1 ¶ 33.  The Court concludes that there is not.

The statement that Patriot presents a "great opportunity" for North Fork is a statement of opinion.  *See Moore v. Thomson Reuters (GRC) Inc.*, 2017 WL 4083582, at *6 (S.D.N.Y. Sept. 14, 2017) ("Defendant's alleged misrepresentations that relocation would be a 'great opportunity' and in Plaintiff's 'best interest' are non-actionable statements of subjective opinion."); *Glidepath Holding B.V. v. Spherion Corp.*, 2010 WL 1372553, at *9 (S.D.N.Y. Mar. 26, 2010), *aff'd*, 425 F. App'x 76 (2d Cir. 2011) ("[S]tatement that Spherion 'envisione[d] a promising market opportunity' was a forward-looking statement of opinion.").  "Although statements of opinion generally are not actionable in a fraud cause of action, . . . statements of opinion may nevertheless be actionable as fraud if the plaintiff can []prove that the holder of the opinion did not subjectively believe the opinion at the time it was made and made the statement with intent to deceive."  *N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2021 WL 4124950, at *6 (S.D.N.Y. Sept. 9, 2021) (quoting *M&T Bank Corp. v. McGraw Hill Cos., Inc.*, 5 N.Y.S.3d 783, 785 (4th Dep't 2015)).

In other words, a fraud claim based on an expression of opinion is actionable in an appropriate case not because the opinion is objectively wrong.  Rather, in an appropriate case it is actionable because the speaker either did not in fact hold the opinion stated or because the speaker subjectively was aware that there was no reasonable basis for it . . . .  In the first instance, the speaker will have lied as to his or her subjective mental state.  In the second, he or she implicitly would have represented that there was a reasonable basis for the statement of opinion, knowing that the implicit representation was false.

*Id.* (quoting *M&T Bank Corp.*, 5 N.Y.S.3d at 785) (cleaned up).

Plaintiff appears to argue that Erb knew this statement was false "because he was aware Patriot was failing to meet financial projections" and Patriot would cease to exist without Plaintiff's investment.  Dkt. No. 140 at 19.  Plaintiff's argument is unconvincing for several reasons.  First, there is no evidence to support the notion that in March 2018, Patriot was in the position where if North Fork had not provided the loan to Patriot, Patriot would have failed.  Plaintiff cites Bracken's testimony for the proposition that the North Fork investment was necessary for Patriot's continued survival.  But what Bracken actually testified to was that Patriot needed money in order to make loans and, as a consequence, was "looking for capital all the time" and was "always looking for new funding, additional funding."  Dkt. No. 123-5 at 52.  That Patriot needed to obtain capital to extend capital is not evidence that it was on the brink of failure or that an investment in it would not be a positive one.  It was the nature of Patriot's business that the capital it extended was capital that it obtained; it was not in the business of financing the loans in their entirety and, if it did not have capital from others to deploy, it would not be able to make additional loans.  There is no evidence that North Fork was the only potential source of additional funding.  To the contrary,  Elias testified: "North Fork wasn't the only entity out there that provides sub debt to companies.  So if it wasn't North Fork I'm sure someone else would have loved to provide sub debt to this company."  Dkt. No. 123-2 at 77.  Thus, to accept the notion that Erb would have known that Patriot was failing (or indeed to

accept the notion that Patriot *was* failing), one would have to accept the notion that any business that relies upon third-party funding for its continued operations would by virtue of that fact alone be on the verge of failure.  The Court will not do so.

That Patriot, shortly after Plaintiff agreed to extend financing to Patriot, ended up failing does not mean that the chance to extend that opportunity would not have been a "great" one at the time Erb made the statement in March 2018.  *See JSMS Rural LP v. GMG Cap. Partners III, LP*, 2006 WL 2239681, at *2 (S.D.N.Y. Aug. 4, 2006 ("[E]ven if JSMS has now established that it has lost money on its investment, it still has not shown that it suffered a loss caused by the alleged fraud.").  The value of the investment opportunity in Patriot, like any investment opportunity, was a function of the balance of risk and reward.  Plaintiff was promised a tremendous reward for extending financing to Patriot on a basis where it was subordinated to Congressional.  As the subordinated lender, Plaintiff was paid an 18% interest rate for its loan, compared with Congressional's 5.7% interest rate.  As the subordinated lender, it also took a risk—Patriot's business might not be successful and, if it was not successful, Congressional would be paid in full for the financing it extended before North Fork was paid.  That is why Plaintiff was promised such a high rate of interest.  As it turned out, Plaintiff's bet turned out to be a poor one.  It lost money.  But the fact that it lost money cannot convert its claim into one for fraud without giving disappointed investors in a business that relies on debt financing the opportunity after its bet has gone bad to recoup from a third party losses on a gamble it knowingly undertook.

Moreover, that Patriot was failing to meet projections in the approximately three months after Congressional invested in Patriot and after the date that Erb made this statement also does not raise a triable issue of fact that Erb did not subjectively believe the opinion at the time it was

made.  That argument necessarily rests on the assumption that meeting the projections was

necessary for Patriot's continued existence.  A projection reflects a judgment regarding the

business a company is to do in the future.  *See In re Int'l Bus. Machines Corp. Sec. Litig.*, 163

F.3d 102, 107 (2d Cir. 1998) ("[T]he challenged statements regarding the future payment of

dividends were predictions or opinions, and not guarantees.").  It does not necessarily constitute

a statement of the business the company must do in order to avoid failure.  Here, no evidence

exists either as to how the projection was set (and the relation it bore to Patriot's past business)

or that it was critical that Patriot meet its projections on the dot for any particular month or

several month period in order to survive.  And no evidence supports that Patriot's failure to meet

projections in the first three months of 2018 raised concerns to either Erb or Elias about Patriot's

investment potential.  Erb testified that "[i]t's actually very common or common for borrowers to

not meet their projections."  Dkt. No. 123-at 97.  And, although Elias testified that at some point

in time he "[p]robably" became concerned that Patriot was not meeting their projections, he

could not remember when that was and did not testify to the level of his concern.   Dkt.

No. 123-2 at 49–52.  Erb testified that he was surprised in August 2019 when Patriot defaulted

and could not recall specifically if there was a time that he suspected Patriot was going to

default.  Dkt. No. 123-1 at 31–32.  Erb also could not recall ever seeing documents prior to his

deposition that showed that Patriot was failing to meet projections.  *Id.* at 37–40.  The

differences between the projections and Patriot's actual performance during January, February,

and March of 2018 also were not so drastic that they would have raised red flags.  For example,

while the forecasts projected that Patriot's revenue for March would be approximately,

$134,000, Patriot actual revenue was only $5,000 less—*i.e.*, approximately $129,000.  Dkt.

No. 123-1 at 37; Dkt. No. 140-3.  Such evidence is plainly not sufficient for any reasonable jury to find clear and convincing evidence of fraud.

In addition, the fact that Erb may have had a motive to get North Fork to invest does not mean that he subjectively did not believe Patriot was a great investment when he made the statement.  While a motive to commit fraud may be relevant to the question whether a defendant acted with scienter, "general motives common to most corporate officers do not constitute 'motive' for the purpose of establishing scienter."  *In re Plug Power*, *Inc. Sec. Litig.*, 2022 WL 4631892, at *11 (S.D.N.Y. Sept. 29, 2022) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)).  "Therefore, the desire for the corporation to maintain the appearance of profitability . . . and sustain the success of an investment does not suffice to establish a motive."  *Id.*; *see Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *18 (N.D.N.Y. Mar. 27, 2020) ("[C]apital-raising and profitability motives are insufficient to create a strong inference of scienter."); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 585 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ("[T]he alleged motive to raise capital is a generic one insufficient to support scienter.").

There is no evidence that the motives of Erb and Elias were anything other than those common to all other corporate officers.  They wanted the investment they recommended be made in Patriot to be a successful one.  Erb and Elias never received any revenue of any kind related to Plaintiff's agreement with Patriot, nor is there any evidence that they would have been terminated if the investment failed.  Although the two did "receive discretionary bonuses as part of [their] employment with Congressional, [they] never received a bonus that was in any way related to Congressional's loan to Patriot" and "Congressional's loan to Patriot was one of the smallest in [their] portfolio and was of very minimal importance to the lending business [they]"

oversaw.  Dkt. No. 123-44 ¶ 23; Dkt. No. 123-45 ¶ 20.  Erb got no benefit from introducing Patriot and North Fork and only connected the parties because Plaintiff asked him to do so.  Dkt. No. 123-1 at 61–62.  Thus, their key interest in getting Plaintiff to invest in Patriot appears to have been purely to sustain the success of their investment.  This is too general of an interest to establish a motive to lie.

The Court also concludes that no reasonable juror could find that Plaintiff reasonably relied on this statement—even if it were a misstatement.  The only misrepresentation relied upon by Plaintiff is Erb's statement that "there was a great opportunity [for North Fork] to invest in Patriot."  Dkt. No. 140-1 ¶ 33.  "However, such statements are generally considered, not actionable statements of fact, but mere opinion and puffery."  *DH Cattle Holdings Co. v. Smith*, 607 N.Y.S.2d 227, 231 (1st Dep't 1994) (concluding that statement that company was a "safe investment" was inactionable puffery); *see Ironwoods Troy, LLC v. OptiGolf Troy, LLC*, 166 N.Y.S.3d 730, 734 (3d Dep't 2022) ("[A]lleged misrepresentations are not actionable as fraud when they consist of mere puffery, opinions of value or future expectations, rather than false statements of value." (cleaned up)); *MMCT, LLC v. JTR Coll. Point, LLC*, 997 N.Y.S.2d 374, 375 (1st Dep't 2014) (statement that "the project was in a 'great area' . . . is non-actionable opinion or puffery."); *Sejin Precision Indus. Co. v. Citibank, N.A.*, 2017 WL 4350323, at *7 (S.D.N.Y. June 28, 2017), *aff'd*, 726 F. App'x 27 (2d Cir. 2018) ("The first type of statement is a prediction of future events, which courts applying New York law have held cannot sustain a fraud claim.").  Erb's employer—Congressional—had extended senior financing to Patriot.  He, and Congressional, had an interest in Patriot's success and Patriot's success depended on it continuing to obtain debt financing to use to support its business.  It would stand to reason that Erb and Congressional would believe that the extension of subordinated financing to Patriot

would be a great opportunity.  No reasonable investor could rely on such a vague statement of future optimism about a company in which the speaker was a senior lender.

Moreover, a party cannot claim reliance on a misrepresentation when that party could have discovered the truth with due diligence.  *See OptiGolf Troy, LLC*, 166 N.Y.S.3d at 734. "As the New York courts have stated, the law is well settled that 'if the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.'"  *Samuelson v. Union Carbide Corp.*, 1986 WL 1442, at *3 (S.D.N.Y. Jan. 29, 1986) (quoting *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 600 (N.Y. 1959)); *see ACA Galleries, Inc. v. Kinney*, 928 F. Supp. 2d 699, 703 (S.D.N.Y. 2013), *aff'd*, 552 F. App'x 24 (2d Cir. 2014).  Here, there is no serious dispute that Plaintiff is a sophisticated investor, even if there is a dispute about whether Plaintiff has previously provided a mezzanine loan to any other entity.  Dkt. No. 140-1 ¶ 5. North Fork is in the business of providing financing to companies that are unable to obtain conventional financing.  *Id.*  Plaintiff also had alternative means available to it of confirming whether Patriot was a great opportunity for itself.  Congressional was not the sole source of information about Patriot.  Patriot was also a source of information, and one that was available to Plaintiff.  After Erb allegedly made the statement to Plaintiff on the March 28, 2018 call, Plaintiff conducted due diligence of Patriot before closing on the North Fork Loan, including reviewing Patriot's financial statements and information about loans funded and subsequent payments made to Patriot.  *Id.* ¶¶ 39–45.  There is also no dispute that all materials requested by North Fork for the purposes of due diligence were provided to North Fork by Patriot.  *Id.* ¶ 50.

In addition, prior to closing on the North Fork Loan, Plaintiff, while represented by counsel, was notified of Patriot's technical default on the Congressional Loan and signed off on Congressional's proposed waiver.  *Id.* ¶¶ 71–72.  Plaintiff could have delayed closing on the North Fork Loan beyond August 3, 2018.  *Id.* ¶ 76.

Under these circumstances, no reasonable juror could find that Plaintiff reasonably relied in agreeing in August 2018 to extend financing to Patriot on an oral statement made by a representative of the senior lender to Patriot in March 2018, before any diligence was done, on the value of the investment opportunity.  "What [Plaintiff] seek[s] in this instance is an implausible finding that an experienced" business "incurring a heavy financial obligation, did so on verbal assurances given him by one of the defendants."  *Most v. Monti*, 456 N.Y.S.2d 427, 428 (2d Dep't 1982)

Plaintiff nonetheless points to *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 931 N.E.2d 87 (N.Y. 2010), which it claims stands for the proposition that "a plaintiff's reliance may be justified if the plaintiff took reasonable steps to protect itself from the defendant's deception even if it may have been possible to detect the fraud."  Dkt. No. 140 at 21.  But, that case is easily distinguishable.  In that case, the court noted that where a plaintiff goes through the "trouble to insist on a written representation [as part of a diligence process] that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry."  *Rhone Grp. L.L.C.*, 931 N.E.2d at 91.  Here, however, Plaintiff never attempted to obtain such a written representation nor was Erb's alleged statement made as part of the diligence process.  Instead, from the record, the statement was made informally by a third party; there was nothing that precluded Plaintiff from conducting its own diligence to assure itself that it agreed with Erb's assessment before Plaintiff committed capital to Patriot.  Congressional and

Erb had no special knowledge about Patriot unavailable to Plaintiff as part of the diligence process.  In fact, it did ask Patriot for information.  Under these circumstances, it was not reasonable for Plaintiff to rely on Erb's statement in making its commitment.  To hold otherwise would convert every statement that an investor makes to another touting an investment into a free option.  The recipient of the informal advice could act upon it, without any further diligence, secure in the knowledge that if the investment proved not to be positive, it could sue—not the company in which the recipient invested—but the third party who made the original suggestion. Such a holding would effectively read out the "reasonableness" element of the reasonable reliance requirement.

The Court therefore grants summary judgment as to this sole claim against Erb and Elias.

## II.    Bracken

Bracken moves for summary judgment as to the sole fraud claim against him, arguing that the entire basis for the claim comes from a discrepancy between the July 12 Report and the July 31 Report.  Dkt. No. 131 at 1.  Bracken notes that, as required under the North Fork and Congressional Loans, Patriot prepared monthly collateral loan reports, yet North Fork had not analyzed any of the reports except the last two, the July 12 Report and the July 31 Report.  *Id.*  In addition, Bracken argues that the discrepancies between the two reports have nothing to do with fraud and Plaintiff has even admitted that the July 31 Report could be the one that is erroneous. *Id.*  Bracken also argues that should Plaintiff, in opposition to summary judgment, try to assert other claims for fraud that were not pleaded in the Operative Complaint, those claims should be deemed waived.  *Id.*

In response, Plaintiff claims that there is a dispute of material fact as to whether Bracken provided false monthly reporting to Plaintiff to make it appear that Patriot was in better financial health than it was.  Dkt. No. 142. at 7.  Plaintiff also claims that there is a genuine issue of

material fact concerning whether Bracken concealed projection information from Plaintiff and made false statements on August 3, 2018 to induce Plaintiff to make a loan.  *Id.* at 8.

The Court notes that Plaintiff may only base its fraud claim against Bracken at the summary judgement stage on the allegations of fraud actually pleaded in the Operative Complaint—*i.e.*, on the allegedly false monthly collateral reports that Bracken provided to Plaintiff.  In other words, it may not base its fraud claim on allegations that Bracken made material omissions to Plaintiff or that Bracken made false statements on August 3, 2018 to induce Plaintiff to make a loan.

As already mentioned, this Court, in its Opinion and Order on Defendants' motions to dismiss, dismissed all claims against Plaintiff for "*omissions* rather than misrepresentations." Dkt. No. 71 at 5 n.2.  The Court noted that "[a]s a general matter, 'an omission does not constitute fraud unless there is a fiduciary relationship between the parties,' *id.* (quoting *Cobalt Partners, L.P. v. GSC Cap. Corp.*, 944 N.Y.S.2d 30, 35 (1st Dep't 2012)), and "[t]here was no fiduciary duty between Bracken, Henagan, and Spencer and Plaintiff," *id.*  In addition, the Court found that the "special facts doctrine" did not apply as "Plaintiff has alleged fraud against Defendants Bracken as well as Henagan and Spencer for misrepresentations they made after the transaction occurred."  *Id.*  Because "Plaintiff did not move to reconsider or move to file a [third] amended complaint to revive this theory," *In re Allergan PLC Sec. Litig.*, 2022 WL 17584155, at *21, Plaintiff cannot now at the summary judgment stage reassert its claim for fraud based on omissions, *id.*

With regard to any alleged false statements that Bracken made on August 3, 2018, the Operative Complaint is entirely bereft of allegations concerning such statements nor are such statements pleaded with particularity as required by Federal Rule of Civil Procedure 9(b).  Dkt.

No. 55.  Plaintiff thus may not rely on this theory of fraud at this stage of the case to oppose a

motion for summary judgment.  *See In re Allergan PLC Sec. Litig.*, 2022 WL 17584155, at *22

("A Plaintiff may not, in opposing a motion for summary judgment, rely on theories not set forth

in the Complaint."); *see Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 549 (D.

Conn. 2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019) ("[T]he Court may not consider 'unpleaded

allegations' in its ruling on a motion for summary judgment."); *Lyman v. CSX Transp., Inc.*,

364 F. App'x 699, 701 (2d Cir. 2010).  This is particularly true for claims for fraud, which, as

per Federal Rule of Civil Procedure 9(b), must be pleaded with particularity.  *See United States*

*ex rel. Hussain v. CDM Smith, Inc.*, 2019 WL 1428360, at *6 n.6 (S.D.N.Y. Mar. 29, 2019)

("Plaintiff's Brief in Opposition to Summary Judgment . . . is an insufficient means by which to

satisfy the requirement of Rule 9(b).  Fraud must be alleged with particularly in the pleadings;

that is, a complaint, answer, reply to a counterclaim, or answer to a cross-claim.  Anything else,

including Plaintiff's Brief in Opposition, is merely a motion or paper . . . .  Plaintiff cannot rely

on his opposition brief to add specificity to allegations in the Complaint which should have been

pled with particularity at the outset and which, even after discovery, the facts do not support."

(citation omitted)).

      The Court thus will analyze only whether there is a triable issue of fact regarding the

allegedly fraudulent monthly collateral reports sent by Bracken to Plaintiff.  The Court holds that

there is not.  First, Plaintiff does not dispute that it did not analyze "whether collateral reporting

by Patriot prior to July 2019 was incorrect."  Dkt. No. 142-20.  Therefore, the only reports that

can be the basis of the fraud claim are either the July 12 Report or the July 31 Report.  Plaintiff,

however, does not contend that the July 31 Report was erroneous; instead, it contends that the

July 12 Report was the erroneous one.  Dkt. No. 142-1 ¶ 88.

Even assuming that Plaintiff has proffered sufficient evidence that the July 12 Report was materially false, there is wholly insufficient evidence in the record that Plaintiff suffered any injury based on any misrepresentation in that report. "[T]o give rise, under any circumstances, to a cause of action, either in law or in equity, reliance on the false representation must result in injury." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1183 (N.Y. 2018); *see also Passiglia v. Northwell Health, Inc.*, 252 F. Supp. 3d 129, 139–40 (E.D.N.Y. 2017); *Mid Atl. Framing, LLC v. Varish Const., Inc.*, 117 F. Supp. 3d 145, 154 (N.D.N.Y. 2015). In its opposition to the motion for summary judgment, Plaintiff claims that Bracken's fraudulent reports, together with the misrepresentations of Erb, caused Plaintiff to lose the money it agreed to loan to Patriot. Dkt. No. 142 at 25. Plaintiff notes that such fraudulent reports caused it to invest in Patriot and that, absent those reports, it would not have invested in Patriot's subordinated debt and would not have lost $650,000. *Id.* But, even if certain allegedly false statements caused Plaintiff to invest when it otherwise would not have, the July 12 Report could not have been one of those statements. That is because Plaintiff ultimately closed on a $650,000 mezzanine loan to Patriot on August 3, 2018. Dkt. No. 140-1 ¶ 38; Dkt. No. 143-1 ¶ 5. And, the July 12 report was not provided until approximately one year after Plaintiff closed on the loan—*i.e.*, on July 12, 2019. Dkt. No. 143-1 ¶ 23. It therefore could not have been relied upon by Plaintiff when it decided whether or not to invest in Patriot one year earlier. *See DH Cattle Holdings Co*, 607 N.Y.S.2d at 231 ("The documents provided to defendant were received after he made the investment, and thus the required element of reliance is absent."). Plaintiff also offers no alternative theory of how it incurred losses as a result of any statements in this report. In fact, Plaintiff did not contest, in response to Henagan and Spencer's Rule 56.1 Statement, that the "[July 31 Report] and all previous reports were sent in compliance with the

Congressional Loan and the North Fork Loan, and not for any other purpose, such as to seek additional loan amounts from Congressional or Plaintiff." Dkt. No. 143-1 ¶ 29. The Court therefore grants summary judgment as to this claim.

## III.    Henagan and Spencer

### A.    Fraudulent Conveyance

Plaintiff argues that there exists an issue of material fact as to its fraudulent conveyance claim against Henagan and Spencer based on the management fee of $33,000 that they received from Patriot in 2018. Dkt. No. 143 at 14.

That claim is based on former New York Debtor & Creditor Law § 273, as it was in effect before its repeal and substitution by New York's version of the Uniform Voidable Transfer Act effective April 4, 2020.[3]  Section 273 states

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

N.Y. Debt. & Cred. Law § 273 (2020) (repealed Apr. 3, 2020); *see id*. § 272 (2020) (repealed Apr. 3, 2020) ("Fair consideration is given for property, or obligation, (a) When in exchange for such property, or obligation, as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt is satisfied . . . ."). "[U]nder § 273, 'the burden is on the party challenging the conveyance to prove both insolvency and the lack of fair consideration.'" *Shams v. Fisher*, 107 F. Supp. 2d 266, 283 (S.D.N.Y. 2000).[4]

---

[3] The new provisions of New York's version of the Uniform Voidable Transfer Act do "'not apply to a transfer made or obligation incurred before' the act's effective date, 'nor shall [they] apply to a right of action that has accrued before [that] effective date.'" *Ray v. Ray*, 799 F. App'x 29, 31 (2d Cir. 2020) (quoting 2019 N.Y. Sess. Laws Ch. 580 (McKinney)).

[4] Creditors have standing to pursue claims for avoidance of a transfer or obligation of the debtor to the extent necessary to satisfy the creditor's claim. *See* N.Y. Debt. & Cred. Law § 273 (2020) (repealed Apr. 3, 2020); *id*. § 276; *see also Riis v. Manufacturers Hanover Tr. Co.*, 632 F. Supp.

In this case, Plaintiff has proffered no evidence to support either of these elements—*i.e.*, insolvency and lack of fair consideration—and therefore summary judgment is granted as to this claim. *See Fisher*, 107 F. Supp. 2d at 283. Plaintiff merely states that "Henagan and Spencer claim that Patriot in fact paid $33,000.00 for a bill dating back to 2018," Dkt. No. 143 at 14, and "this admission presents a genuine issue of material fact as to whether the payment constitutes a fraudulent conveyance under Count One," *id.* at 14–15. But, the fact that Patriot may have paid Henagan and Spencer money and eventually been rendered insolvent does not mean that Patriot was insolvent at the time of the payment or was rendered insolvent thereby or that the payment was made without a fair consideration. *See Fisher*, 107 F. Supp. 2d at 283. To the contrary, evidence supports that it was not until closer to August of 2019 that Patriot became insolvent— not 2018 when the management fee was paid. Dkt. No. 143-1 ¶ 15. Plaintiff also does not contest that the management fee was "reasonably equivalent value for the management services that HSCP provided to Patriot Finance in 2018." *Id.* ¶ 16. Summary judgment is therefore granted as to this claim.

### B.    Fraud

Henagan and Spencer move for summary judgment as to the fraud claim against them on the basis that there is no evidence that Henagan or Spencer played any role in any fraudulent misstatements to Plaintiff and, even if there were, there is no evidence of intent. Dkt. No. 135. In response, Plaintiff contends that the Court should deny summary judgment on this claim as there is a triable issue of material fact as to its fraud claim against Henagan and Spencer concerning their involvement in (i) allegedly fraudulent monthly collateral reports that were provided to Plaintiff; (ii) allegedly false statements from Bracken to Plaintiff on August 3, 2018

---

1098, 1101 n.2 (S.D.N.Y. 1986).

that Patriot was in good financial health and that no materially adverse change in its financial health had occurred from March 2018 to August 2018; and (iii) fraudulent omissions, specifically failure to disclose projection data.  Dkt. No. 143.

The Court again rejects Plaintiff's argument that it may base its fraud claim against Henagan and Spencer on any fraudulent omissions.  As previously noted, this Court, in its September 9, 2021 Opinion and Order, dismissed the fraud claim against Henagan and Spencer to the extent it was based on omissions not misrepresentations.  Dkt. No. 71 at 5 n.2; *see In re Allergan PLC Sec. Litig.*, 2022 WL 17584155, at *21.  The Court also rejects Plaintiff's attempt to base its fraud claim on the allegedly false statements from Bracken to Plaintiff on August 3, 2018.  Plaintiff did not plead this theory of fraud in the Operative Complaint.  Dkt. No. 55.  Instead, Plaintiff alleged solely that Bracken, Henagan, and Spencer were liable for fraud based on the monthly collateral reports that were sent to Plaintiff and Congressional.  *Id.* ¶¶ 68–89.  Plaintiff thus may not now rely on this theory of fraud in opposing summary judgment.  *See In re Allergan PLC Sec. Litig.*, 2022 WL 17584155, at *22; *CDM Smith, Inc.*, 2019 WL 1428360, at *6 n.6.

Plaintiff accordingly may only rely on evidence of Henagan's or Spencer's involvement, if any, in the allegedly fraudulent monthly collateral reports sent to Plaintiff.  Moreover, it may only rely on those monthly collateral reports prior to the July 31 Report, as the Court, in its September 9 Opinion and Order, dismissed the fraud claims against Henagan and Spencer based on the July 31 Report and any subsequent report.  The Court noted that "Plaintiff has failed to state a claim that the [July 31 Report]—or any subsequent report—was fraudulent."  Dkt. No. 71 at 9.

Henagan and Spencer argue that there is no evidence that they played any role in the preparation of any report prior to the July 31 Report.  Dkt. No. 135 at 2.  They also note that "Plaintiff's witnesses testified that they have conducted no analysis as to the accuracy or inaccuracy of any of the monthly reports preceding the July 12, 2019 report, and Plaintiff has proffered no evidence of any misrepresentations in them."  *Id.*  In addition, Henagan and Spencer argue that there is no intent to induce reliance as all monthly reports were sent consistent with the loan documents and not sent for any other purpose—*i.e.*, to seek a further loan from Plaintiff to Patriot.  *Id.* at 17–18.  In response, Plaintiff argues that even before it provided the loan to Patriot, it relied on the monthly reports that "intentionally and materially inflated the business of Patriot" and that Henagan must "as a matter of law, be charged with the knowledge that the data submitted in the reports was false" due to their roles as part of the company's board of directors.  Dkt. No. 143 at 16.  Plaintiff also notes that it "relies on the well-settled group pleading doctrine, which allows a plaintiff to rely on a presumption that written statements that are group-published, are statements made by all individuals with direct involvement in the day-to-day business of the company."  *Id.* at 16–17.

The Court grants summary judgment in Henagan's and Spencer's favor on this claim. The parties do not dispute that, prior to his termination and the July 31 Report, Bracken sent all monthly reports to Congressional as required under the Congressional Loan as well as to Plaintiff as required under the North Fork Loan.  Dkt. No. 143-1 ¶ 10.  The parties also do not dispute that Henagan and Spencer had no personal involvement in the preparation or approval of any monthly reports sent by Bracken to Congressional or Plaintiff.  *Id.*  The parties do not dispute that while the Operative Complaint alleges that Henagan sent collateral reports to Plaintiff on November 14, 2018, and November 15, 2018, Henagan denies doing so, and Plaintiff has not

produced the alleged November 14, 2018, and November 15, 2018 collateral reports in this litigation. *Id.* ¶ 12. Moreover, Fernando could not provide any details on these alleged reports when asked about them. *Id.* ¶ 13. In other words, there is no evidence in the record that, even if any of these pre-July 31 reports were fraudulent, Henagan and Spencer had any personal role in their preparation or approval. Nor is there evidence that Henagan and Spencer had any knowledge of any fraudulent statements therein. To the contrary, the evidence establishes that Henagan and Spencer were not involved in the day-to-day operations of Patriot and had no experience, prior to August 2019, using the Goldpoint system, which was used to pull data for the monthly collateral reports. Dkt. No. 133-3 at 10–11; Dkt. No. 143-1 ¶ 10.

The Court also rejects Plaintiff's argument that there is a triable issue of material fact concerning Henagan's and Spencer's liability for misrepresentations in any monthly reports based merely on their position on the board of managers of Patriot. A corporate officer is not automatically liable for any fraudulent misrepresentation that its employer makes. Instead, "[a] corporate officer may be held personally liable for a fraudulent act committed in his or her capacity as a corporate officer" only if that officer "personally participated in the misrepresentation or had actual knowledge of it." *YDRA, LLC v. Mitchell*, 1 N.Y.S.3d 206, 207 (2d Dep't 2014); *see Marine Midland Bank v. John E. Russo Produce Co.*, 405 N.E.2d 205, 212 (N.Y. 1980). "Mere negligent failure to acquire knowledge of the falsehood is insufficient." *John E. Russo Produce Co.*, 405 N.E.2d at 212; *see Interstate Foods, Inc. v. Lehmann*, 2009 WL 4042774, at *3 (S.D.N.Y. Nov. 23, 2009). Here, Plaintiff offers no evidence that Henagan and Spencer were personally involved in the preparation of the monthly collateral reports prior to the July 31 Report, nor that they had knowledge of any alleged misrepresentations therein. *See Lehmann*, , 2009 WL 4042774, at *3.

Furthermore, the Court rejects Plaintiff's attempt to invoke the group pleading doctrine to deny summary judgment in favor of Henagan and Spencer.  "The Court is aware of no authority in this Circuit for converting the pleading doctrine into a substantive ground for fraud liability." *S.E.C. v. Espuelas*, 699 F. Supp. 2d 655, 662 (S.D.N.Y. 2010); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 639 (S.D.N.Y. 2017) ("[T]he group-pleading doctrine merely creates a presumption at the pleading stage, and [] certainly, at trial or summary judgment, plaintiffs will need to provide proof that the individual defendants did in fact have ultimate authority over the statements in order to hold them liable." (cleaned up)).  The presumption is also rebuttable.  *See Espuelas*, 699 F. Supp. 2d at 662.  And, Henagan and Spencer have both proffered evidence that they did not have any involvement in or knowledge of any misrepresentations in the monthly collateral reports prior to the July 31 Report.  Dkt. No. 133-1 ¶¶ 9, 11, 20, 23 (Henagan Declaration: "I had no involvement in the preparation or approval of any monthly reports sent by Bracken to Congressional."); Dkt. No. 133-2 ¶¶ 11 (Spencer Declaration: "I had no involvement in the preparation or approval of any monthly reports sent by Bracken to Congressional."), 19 (Spencer Declaration: "To this day, I have no information to support a claim that Bracken committed fraud against North Fork or anyone else.").

Plaintiff cannot forestall Henagan's and Spencer's request for summary judgment by pointing to allegations in Plaintiff's complaint as proof of Henagan's and Spencer's liability. Dkt. No. 143 at 16.  A complaint provides notice to the adverse party of the facts that the plaintiff will attempt to develop in discovery and prove at trial.  A complaint is not itself evidence of the underlying facts it alleges.  And, "Rule 56(e) 'provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials

of his pleading.'" *Indem. Ins. Co. of N. Am. v. Unitrans Int'l Corp.*, 2021 WL 9677887, at *2 (E.D.N.Y. Aug. 5, 2021) (quoting *Anderson*, 477 U.S. at 256); *see also Gil-Cabrera v. City of New York*, 2023 WL 2601132, at *1 n.1 (S.D.N.Y. Mar. 22, 2023) (same).

The Court therefore grants summary judgment as to this claim.  Plaintiff has proffered no evidence that either Henagan or Spencer made any material, false statement alleged in the Operative Complaint.[5]

## CONCLUSION

The motions for summary judgment are GRANTED.  The Clerk of Court is respectfully directed to close Dkt. Nos. 122, 127, 132 and to close the case.


SO ORDERED.


Dated: June 7, 2023
        New York, New York                    _____
                                                              LEWIS J. LIMAN
                                                     United States District Judge

---

[5] The Court also grants summary judgment on this claim for the reasons detailed in Discussion Section II.  There is no evidence that any of the reports prior to the July 12 Report contained fraudulent misrepresentations and there is no evidence that Plaintiff suffered any damages as a result of its reliance on the July 12 Report.